Anderson, J.
In July, 1857, the defendant in error, for his sole use, effected a policy of insurance for ten thousand dollars with the Manhattan Life Insurance Company, the plaintiffs in error, upon the life of his brother, William Sidney Warwick, of Powhatan county, Virginia, who was largely indebted to him. The plaintiff in error was .a New York company, and the policy was effected through their agent in Virginia, J. B. Maemurdo. The premiums on the policy were punctually paid by the defendant in error to their agent in Richmond, up to July 23d, 1862: and the premium for that year, due on that day, he then offered to pay to said agent in New York funds; but he refused to receive payment, under alleged instructions from his principals not to renew or continue policies. Pour months after, on the 23d of November, 1862, Wm. Sidney Warwick died; of which the company had due notice.
After his death the company refused to pay the policy to Corbin Warwick, and he brought this suit to recover it in the Circuit court of Richmond city, which rendered judgment in his favor for the amount of the *620 policy, less the last premium. And the company have brought the case here upon a writ of error.
The case presented by the record, is this in brief: They refbsed to receive the last premium when it fell due and was tendered, and now refuse to pay the policy because the premium was not paid; and, moreover, claim of the defendant in error a forfeiture of the premiums which he had paid, amounting to §6,155, besides interest: and they invoke the intervention of this court to sustain them in these pretensions. If this was the contract, fairly interpreted according to its legal effect, however harsh in its operation upon the defendant in error, it must be carried out.
The first question, therefore, which we have to consider is, What was the contract between these parties ? Without incumbering this opinion with a minute and critical examination of the policy, I will simply state what, in my opinion, the contract is, according to the legal import and effect of the policy. It is a contract of the company by deed poll, to pay to Corbin Warwick, for his sole use, ninety days after due notice and satisfactory evidence of the death of Wm. Sidney Warwick, ten thousand dollars, for the consideration of $1,031 in hand, paid by the said Corbin, and a like •sum of $1,031, to be paid by him annually, on the 23d of July, “ for the term of the natural life of the said Wm. S. Warwick;” subject to defeasance upon the non-performance of various conditions minutely ■detailed; among others, the non-payment of the premiums, or either of them, on the day they fall due; in which case the company is not to be liable for the sum assured, or any part thereof; but the policy shall cease and determine. And it is further stipulated that, in •every case where the policy shall cease or become void, all previous payments thereon shall be forfeited to the •company.
The policy is one entire contract, not from year to *621 year as premiums shall he paid, hut for the whole term of the life of ¥m. S. Warwick, upon condition, that if the annual premium is not paid on the 23d of July the policy shall cease and he void: as was held in Ruse v. Mutual Benefit Life Insurance Co., 26 Barb. R. 556, upon the construction of the policy in that case; the terms of which are very much the same as in this. That case, and also the case of Hodsdon, adm’x v. Guardian Life Insurance Co., 1 Biggelow R. 219, 97 Mass. R. 144, fully sustain this construction. It is not a contract of indemnity, as a policy against fire, for a definite period; hut it is a contract to pay a certain sum of money, for the consideration mentioned, upon the happening of an event which is inevitable, and only uncertain as to the time it may transpire.
It is a corollary from the contract, thus understood, that the company, when they executed this deed, assumed an obligation to pay the sum assured to Corbin Warwick, from which they could not he relieved by anything they could do or leave undone; but only by the act or omission of the assured. Consequently, the company could not relieve itself from this obligation, or subject the other party to a forfeiture, by refusing to receive payment of a premium; or by hindering or preventing the other party from paying it; or by any disability on its part to receive it, and which prevented the payment, which was not provided for in the contract. If the assured was at the place on the day, where and when payment was to he made, and where he had a right to make payment, ready and prepared to make payment, hut was prevented by either of the causes mentioned, it would he unreasonable to say that he had incurred the forfeiture. And I think it is equally clear, upon reason and authority, that the company was not thereby released from its obligation to pay the sum assured. It would he a monstrous perversion of law, and repugnant to our every sense of *622 justice, to say that this company, after having received more than half the sum assured, could by this act determine the policy, hold on to the money they had received, and to say to their confiding victim, “ you may whistle to the winds for your merited reward, notwithstanding you relied upon our covenant and good faith to pay it.”
• And, although the case cannot be so strongly put, I think it is equally clear, that when the assured was involved in no default, but was at the place when and where payment was to be made, ready and willing to pay, but was prevented by the disability of the company to receive payment, from whatever cause, he having had no agency in producing it, the company is not entitled to claim the forfeiture, or to be relieved from its obligation to pay the sum assured.
The question upon this view qf the case is suggested:, was the assured, on the 23d of July, 1861 and 1862, at the place where the premiums were payable, ready and prepared and offering to pay them ? He was at the office of the agent, J. B. Macmurdo, in the city of Richmond, and then and there offered to pay the premiums which fell due on those days respectively, in the kind of funds which the company required. On the first of those days, Macmurdo received payment in New York funds, or its equivalent, in discharge of the obligation, and gave his receipt therefor, as agent of the company. On the last day mentioned, the assured offered to pay Macmurdo, the agent, but he refused to receive it, upon the ground, as he alleged, that he was instructéd by the company not to receive payment “ nor to renew or continue policies.” How, upon this contract the questions arise, first, was the city of Richmond or the city of New York the place of payment ? and, secondly, was Macmurdo the agent, or an officer in New York the agent, to whom payment was to be made?
*623 I think when this contract is interpreted in reference to its terms and subject matter, the situation, character and legal status of the parties; the act of assembly of Virginia, under authority of which it was made, and which must be read as a constituent part of it; and with reference to the usage of the company, and the conduct of the parties in its execution, it must be regarded as a Virginia contract, made in Virginia, with the Virginia agent, and to be performed in Virginia through that agent; and that it was intended by the parties, and so understood by them, that the payment of the premiums were to be made to the agent at Richmond; and if made or tendered to him at the time they respectively fell due, it would be a fulfilment -of the condition required of the assured. To take a comprehensive view of the whole case, I cannot come •to a different conclusion.
The defendant in error and "Wm. S. "Warwick were resident citizens of Virginia, and the plaintiff in error a corporation of the State of New York. It was created by a law of that State, and cannot exist outside of its limits. It had no power to make contracts or to do business in Virginia, but by permission of the State. In Paul v. Virginia, 8 Wall. R. 168, Mr. Justice Field, -delivering the opinion of the Supreme court, says: “Having no absolute right of recognition in other States, but depending, for such recognition, and the •enforcement of its contracts upon their assent, it follows, as a matter of course, that such assent may be .granted upon such terms and conditions as those States may think proper to impose. They may exclude the foreign corporation entirely; they may restrict its bu■.siness to particular localities; or they may exact such ■security for the performance of its contracts with their -citizens as in their judgment will best promote the public interest. The whole matter rests in their dis■cretion.” Again, on p. 183, he says: “ The-policies do *624 not take effect, are not executed contracts, until delivered to the agent in Virginia. They are, then, local' transactions and governed by local laws.” In Slaughter’s case, 13 Gratt. 767, J. Samuels says: “I have no doubt of the power of tbe General Assembly of Virginia to forbid foreign corporations from engaging in any pursuit within the State; and of consequence to grant permission to engage therein only upon terms.” The Legislature of Virginia, consistently with this, well established principle, enacted a law with regard to foreign corporations. Chapter 39, section 23, of' Code of 1860, provides, “that no insurance company, unless incorporated by the Legislature of this Commonwealth, shall make any contracts of insurance, within this State until such insurance company shall have complied with the provisions of this act.”
The 24th section provides, “that every such insurance company shall, by a written power of attorney,, appoint some citizen of the Commonwealth resident therein its agent or attorney.” This is the first provision. And no foreign insurance corporation could make a contract in this State until such agent was appointed. But it imposes this further condition, that such agent shall accept service of process, &c., in these words: “Who shall accept service of all lawful processes against such company in this Commonwealth, and cause an appearance to be entered in any action,, in like manner as if such company had existed and been duly served with process in this State.” And. the 27th section provides, that service of such process; on such attorney, shall be “sufficient service upon his. principal.” These provisions of the act are not words of limitation on the power of the agent, but of enlargement. The first provision requiring them to appoint an agent here is general, and implies, it seems to me, that the company, in all its transactions in this State, must act through that agent, and can act in no *625 other way. It is only known and recognized in this State through that agent. It implies that the company can only make contracts through him, and receive and enforce their performance through him. He is the sole representative -of the company in this State. The term implies a general agency, limited only to the transactions of the company in this State; hut would not embrace, I apprehend, hy that general term, the power to accept the service of legal process, and to enter an appearance for the company when sued, if it had not been so expressed. The right of action or suit against the company in the Virginia courts, without some such express provision, would not have been required merely hy providing that they should appoint a resident citizen of this Commonwealth their “general agent” here. But this provision gives to the company a sort of local existence in this State, through their representative agent, and shows a purpose and design, on the part of the Legislature, to make its transactions within this State local, and subject to the jurisdiction of the State, as effectually as if it had been incorporated in this Commonwealth. The 25th section requires the company to file a copy of the power of attorney, duly certified and authenticated, with the auditor of public accounts, &c.
The 26th section requires the company to have an agent here at all times, without interruption, “while any liability remains outstanding on such insurance.” The 28th section imposes penalties upon the agent who shall effect policies of insurance in this State without complying with the requisitions of the act. I think, therefore, that the construction given to this act, that it only contemplates and provides for the service of legal process, and the prosecution of suits against the company in this State, is too restrictive. This more clearly appears from subsequent sections. The 29th section requires the agent to make return, on oath, to *626 the auditor of public accounts, on tbe first Monday of October and May, in every year, “ of the amount of premiums received and assessments collected during tbe said period.” And also that be “shall at tbe same time pay into tbe treasury sucb tax as may be imposed by law, on tbe amount of sucb premiums and assessments; and tbe whole sum received for policies, whether paid in money or other obligations, shall be deemed to be premiums for tbe purpose of this section.” This section treats tbe agent as if be were tbe company in Virginia, and imposes duties on him which be could not perform if be were not tbe receiving agent of tbe company in Virginia. And this section clearly treats him as sucb. How could be make oath to tbe amount of premiums received, if they did not pass through his hands? And, indeed, who else could collect the assessments due the company in the State, and receive the premiums, he being the only agent of the company here ? Or, who would be willing to incur such responsibilities for tbe payment of taxes, as agent for tbe company in this State, if the premiums and assessments were not to be paid through him, but to be paid directly, by the parties by whom they were paya^ ble, to tbe agent or officer of tbe company in New York. Sucb an idea is repugnant to the whole scope and policy of tbe law.
The 30th section imposes a penalty of $1,000 upon the agent for failing to make such returns, or for making a false return. With what reason could the agent have been subjected to such a penalty by the Legislature, if it had not been intended that he should be the •only agent of the company for receiving the premiums and collecting tbe assessments, and therefore would, have personal knowledge of what he is required to affirm. A bond in the penalty of from $1,000 to $5,000, at tbe discretion of tbe auditor, to make tbe semi-an *627 nual returns, and to pay the tax, is required to be given through the agent.
But the 32d section, I think, fully confirms this construction of the law. It prohibits any one to act as agent of the company, to make or renew, directly or indirectly, any contract of insurance within this State, ■or with any person resident therein, otherwise than in compliance with the provisions of this act, or in any way contrary to its true intent and meaning, under the pienalty of $500, for every such offence. The prohibition in this section is express. Ho one, except the agent appointed as is provided in this act, can make or renew such contracts for the company in this State. Consequently, a contract of insurance, or renewal, made by the plaintiff in error within the State of Vir.ginia, or with any person resident in Virginia, through ■one of its officers in New York, would fall directly within the prohibition of this 32d section. Therefore, reading the contract in connection with this act of Assembly as a constituent part of it, though it professes to have been sealed by the company, and signed by the president and secretary, and delivered in New York •(which cannot be true as to the delivery), it was not made by them directly or indirectly; but was made .at Richmond with Macmurdo, and countersigned by him, who received the advance premium at Richmond, and there and then, and not until then, it became a ■contract. The signing by the president and secretary gives no validity to the instrument; but it derives its force and effect, as a contract, from the signing and delivery of Macmurdo at Richmond; and would be as -effectually, and to every intent and purpose, a contract binding upon the company, if the signatures of the ■president and secretary had not been affixed to it. It was not, and could not be, a contract made with them ■directly or indirectly, by the express enactment of the .Legislature of the State; and their signatures to it *628 have no effect whatever. But the policy itself stipulates that it is “not binding on the company until countersigned by J. B. Macmurdo, at Bichmond, and the advance premium paid.” It was, then, a Virginia contract, to be performed in Virginia through J. B.. Macmurdo, the agent and sole representative of the company in the State. This conclusion is supported by reason and authority. Daniels & al. v. Hudson River Fire Insurance Co., 12 Cush. R. 417, a case directly in point, and Fant & al. v. Miller & Mayhew, 17 Gratt. 47.
Interpreting the policy with reference to its terms, and subject matter, the situation, character and legal status of the parties, and the act of the Virginia Legislature, by authority of which it was made, and which must be read as a constituent part of it, I am clearly of opinion that the contract was made and to bo performed with Macmurdo, the agent of the company afr Bichmond, Virginia; and that payment of the premiums to him, as the agent of the company at Bichmond, by the defendant in error, as they respectively fell due, was a compliance with the terms of the contract, according to its spirit and legal1 effect, and as it was understood by the parties. And, if we consider it further, with reference to the conduct of the parties and the usage of the company, we shall find nothing-adverse to this construction, but much to confirm it.
Tu view of the .facts, that payment could only be made to some agent of the company; that the assured resided in Virginia, where the contract was made; and that the company had an agent here, with whom the contract was made; and by the law was bound to keep an agent here uninterruptedly, through whom alone they could make or renew contracts of insurance with citizens of Virginia; to say that it was contemplated or intended by the parties, or either of them, that the assured must every year, when the premiums were *629 about to fall clue, leave the agent here and go to a distant city to pay the premium to the agent of the com■pany there, would be a most violent presumption. That the contract was not understood as imposing this needless and burdensome condition on the assured, is shown by the conduct of the parties, and the usage, as far as it is exhibited by the record in this case, of the •company. The advance premium, and the three sub■sequent annual premiums, were paid here to their agent Macmurdo, with the unequivocal acquiescence and ratification of the company: and if any objection was ever made, which is very questionable, to the payment of the premium due in 1861, through their agent Macmurdo, it was not made until long after he had received it; and their agent in receiving it violated no instructions,, at any rate none which they could lawfully give; as I shall show. The conduct of the parties, then, was in accordance with the interpretation which I have given to their contract.
But there is an endorsement upon the deed, to which no reference is made on its face, purporting to be a “ notice.” If this endorsement upon the deed is inconsistent wfith its terms or legal effect, and repugnant thereto, it is void. Pullerton v. Agnew, 1 Salk. R. 172. I propose now to notice only one clause, in connection with the point I am considering. It is in these words: “ hTo payment of premium binding on the company, unless the same is acknowledged by a printed receipt signed by an officer of the company.” Is that endorsement inconsistent wfith the construction I have given to the contract, that the premiums w^ere to be paid here to the agent Macmurdo ? It is only in reference to that point that I propose now to consider it. If it is a condition inconsistent with the deed upon its face, or according to its legal effect, upon the authority cited it would be void. But I do not think it is in this point of view. It does not require that the payment *630 shall be made to an officer. It only prescribes a particular kind of evidence, a printed receipt signed by -an officer. Hor does it exclude the signing by the-agent at Richmond. If we will now turn to the receipts which were actually given, we shall find that it does not mean that lyayment shall be made to an officer in New York; but that, on the contrary, the right of' the party to pay to the agent at Richmond is not taken away by this endorsement. To each of these receipts is annexed a condition or declaration, in these words :• “Hot binding until paid and countersigned by J. B. Macmurdo, Esq., agent at Richmond, Ya.” That declaration annexed to the receipt shows, most unquestionably, that when the receipt was signed by the secretary the money had not been paid; and it shows, further, that the money was to be paid to Macmurdo, the agent at Richmond, Ya.; and, when paid to him there,, he was to sign the receipt and deliver it to the assured. This usage of the company, if it may be so called, is-in perfect accord with the foregoing interpretation of' the contract.
I am clearly of opinion, therefore, that; according to-the true intent and meaning of the contract, the premiums were to be paid by the assured to the agent of the company in Richmond, Ya., and not to the officer- or agent of the company in New York.
But it is contended,- for the plaintiffs in error, that Macmurdo was not the agent of the company on the-23d of July, 1861, when the premium for that year was. paid to him; or on the 23d of July, 1862, when the-premium was tendered to Mm by the assured, and by him refused; because they say that the war, and also-their letter to Mm of the 30th of May, 1861, was a revocation of his power. We will consider this assumption on both grounds.
But there is another postulate of the counsel for the-plaintiffs in error, which lies back of this, and should' *631 be considered first, or in connection with it; and that is, that the breaking out of war annulled the contract between the parties, and exonerated the plaintiffs in error from all obligation under it.
Forfeitures are not to be favored. And I should be very reluctant to apply the rule, “ that war dissolves or suspends contracts between alien enemies,” to such a contract as this: and would not do it unless it comes strictly within the rule. As was remarked by Oh. J. Kent, in Clarke v. Morey, 10 John. R. 70, the ancient severities of war have been greatly and justly softened by modern usages, the result of commerce and civilization. And the doctrine once held in the English courts, that an alien’s bond became forfeited by the war, would not now be endured. That would not be more severe and revolting to our sense of justice, it appears to me, than to hold that the assured had in this case by the war forfeited the money he has paid, and his rights under this contract.
The contract in this ease was partly executory, and partly executed. It was altogether executory on the part of the company, in the sense that they had done nothing yet towards the performance on their part. But it had been largely executed on part of the assured, whereby he had become invested with the right to the policy for the life of ¥m. S. "Warwick, which could only be defeated by his default. This right became vested when the advance premium was paid, and was a right to the insurance, not merely for one year, but for the life of Wm. S. Warwick. A new contract every year was not necessary to give the right; but only the annual payment of the premium was necessary to prevent the divesting of the right. The annual payments and giving receipts therefor were not new contracts, but only the performance of a subsisting contract.
The contract being made strictly within Yirginia, *632 with an agent residing there, and who was to continue to reside there as long as any stipulation of the contract was unperformed; an agent with whom the contract was to be performed, and to whom the premiums were to be paid in-Virginia, as has been shown; it seems to me that this case does not fall within the rule as applied, or within the reason of it, as explained and illustrated by the judges, in any of the numerous cases cited by the learned counsel. In all those cases the contract was to be performed in the enemy’s country. Here, the performance is strictly restricted by the contract itself, according to its intent and legal effect, and by the designed policy of the law, by authority of which it was made, to the limits of Virginia. In those cases, and which were particularly relied upon by Judge Story in the case of the~ Rapid, “they had no power to sue in the public courts of the enemy nation.” Hpon this contract they could sue or be sued in the public courts of Virginia, even pending the war.
Griswold v. Waddington, 16 John R. 438, is a leading-case relied upon by the learned counsel for the company, and particularly the following passage in the very elaborate and learned opinion of the Chancellor : “Here, then (the Chancellor observes), we have the final consummation of this discussion, and the sanction of the doctrine we have been tracing, solemnly given by the highest judicial authority in the United States. It reaches to all interchange, or transfer, or removal of property, to all negotiation and contracts, to all communication, to all locomotive intercourse, to a state of utter occlusion, to any intercourse but one of open hostility, to any meeting but in actual combat.” The Chancellor has given us, here, a compend of all the cases to which this doctrine reaches; but unfortunately for the plaintiffs in error, they cannot bring their case within the category. In the performance of this contract by the assured, it was not necessary that there should be any *633 “interchange,” “transfer,” or “removal” of property, from this State into the enemy’s country. Hor did its performance require any “communication,” “locomo tiveintercourse,” “negotiationand contracts,” between him and the plaintiffs in error, or any alien enemy. And a state of “utter occlusion to any intercourse but •one of open hostility, to any meeting but in actual •combat” (if there could have been such a meeting between a man near seventy years of age and a New York •corporation), was not incompatible with the execution ■of this contract. It does not appear that there was, before the war, in the making and execution of it, any intercourse or correspondence of any sort between the -assured and the officers of the company in New York. •Certainly none was necessary. It is most probable 'that they were not known to each other. And if the ■contract could be made and performed before the war without any intercourse between them, there is no reason why it could not be done during the war.
If the law had been framed by the Legislature of Virginia with a special reference to a state of war between tbe States, its adaptation could scarcely have been more complete. The possibility of such a state of war may not have been, and probably was not, in the mind of the Legislature when they enacted this law. But as it was the design of the Legislature to ■protect the State and her citizens against abuses and impositions by these foreign insurance companies, who were not amenable to her laws or subject to her juris•diction, in imposing conditions upon those companies for the privilege of operating in this State, sufficient to give the desired security in time of peace, they were necessarily comprehensive enough to embrace a state of war. And to this end, in framing the law, whether for a state of peace or war, it was necessary to make the operations of the companies within this State ¡strictly local, and subject to the jurisdiction of the *634 State, and completely independent of any foreign jurisdiction in the making, performance, and enforcement of their contracts in this State. This was evidently the leading design of the Legislature in the law which was framed for the purpose. Our difference is. not as to the principle, but as to its application.
In the numerous cases reviewed by the chancellor-in that leading ease, I am under the impression that the principle “that war dissolves the contract,” is not. applied, in a single instance, to a contract made and executed by one of the parties, in the whole or in part, before the war, and where the execution of the contract, on his part, was to be completed before he was entitled to any performance of the other party, and had been partly performed, or where the- dissolution of a contract made before the war would work a forfeiture. Such an application of the rule would be unreasonable, arbitrary and immoral. The parties, in entering into, the contract before the war, did nothing criminal or-unlawful, that they, or either of them, should be liable to the punishment of. a forfeiture of their contract. Hot so where the contract is made during the war. In that case it is unlawful and criminal, and therefore void. And this, it seems to me, is the proper distinction. "When the contract is made before the war, but. not executed by either party, and the carrying it into execution would involve a violation of the duty of the parties respectively to their country in the new relations which the war has created; in that case its execution not having been entered upon, and it being uncertain how long the war* may last and prevent the-execution of the contract, it may be dissolved; and. this not to the prejudice of the parties, or either of them, but for their presumed convenience and benefit to be absolved from the obligation of a contract which, in the changed relations of their countries,' cannot be carried into execution. On the other hand, if the eon- *635 tract is partly executed, and rights under it have vested, and it cannot be dissolved without the loss or forfeiture of one of the parties; and it cannot be carried ■ into execution consistently with the duty of the parties to their countries respectively while the war lasts, in such case it should not be dissolved, but only suspended. But if it can be carried into execution, notwithstanding the war, without conflicting with the obligation of allegiance of either party, it will be neither dissolved nor suspended.
In the very case we are commenting on, the contract, which was the subject of the suit, was made during the war between alien enemies; and there is not, I think, a sentence in the opinion of the Chancellor, or in the cases he reviews, in conflict with the distinction I have taken. , On p. 471, he cites the case of ex parte Boussmaker, 13 Ves. R. 71, which supports it. He says, the Lord Chancellor having had occasion to notice this subject, observed, “that a debt arising from a contract with an alien enemy could not possibly stand; for the contract would be void. But if the two nations were at peace at the date of the contract, it being originally good, upon the return of peace the right to sue would survive.”
Chancellor Kent, commenting on this decision of Lord Chancellor Erskine, says, “the Chancellor here very clearly and accurately marks the distinction between debts contracted before and after the commencement of the war; and he holds the latter to be absolutely void.” And in the later case of Buchanan v. Curry, 19 Johns. R. 137, when this elaborate review of the cases on this subject was fresh in the Chancellor’s memory, he enforced an executory contract made- and partly executed before the war, between citizens of the two countries respectively which afterwards became involved in war. The performance of the contract was completed, pendente bello, by one of the parties., *636 with the agent of the other, who resided in the same country with the former. And the performance with the agent was held good and binding on the other party, who was an alien enemy, residing in the enemies country. But the Chancellor said, “If such a contract had been entered into during the war, it would have been illegal and void.” And again, “It is not unlawful to pay debts, or perform contracts to alien enemies, if the payment be made, or the duty be performed in one country.”
This is a much stronger ease than that. In that there was nothing in the contract or law to limit the performance to the State, or to the local agent; in this there is. In that there would have been no forfeiture, or serious loss to the party, by dissolving the contract; in this there would be a cruel forfeiture to one party, and no loss, but a great gain to the other. In that case the act done was in discharge of an obligation which might have been suspended without loss; this, the performance of a condition to save a forfeiture. In that case, the party could not enforce his contract by suit pendente bello; in this he could. It was held in that case, that “ the rule is founded in public policy, which forbids, during war, that money or other resources shall be transported, so as to aid or strengthen our enemies. The crime consists in exporting the money or property, or placing it in the power of the enemy; not in delivering to an alien enemy, or his agent residing here, under the control of our government.” The principle of that case is not in conflict with the •cases relied upon by the company’s counsel, but clearly takes this case out of the rule applied in those cases; and the decision, it seems to me, is a complete refutation of the argument of plaintiff’s counsel, that the war was a revocation of the agency in this case; a point upon which much stress was laid, and which I will now ■consider further.
*637 In Clarke v. Morey, 10 John. R. 70, Kent, Ch. J., says: “It is even held, if aliens are ordered away in consequence of the war, they are still entitled to leave a power of attorney, and to collect their debts by suit.” In King v. Hansen, 4 Call 259, Hanson, a native of England, came to Petersburg several years before the war of the revolution. After the declaration of independence he refused to take the oath of allegiance to Virginia, and returned to England. Before leaving, he appointed Atkinson & Taylor his attorneys in fact, to make sale of his house and lot in Petersburg. His attorneys made sale of it in 1778, for £1,000, for which they took the bond of the purchaser, payable on demand. After the war Hanson returned, and brought suit on the bond given to his agents for the purchase money; and this court affirmed the judgment of the court below, so far as it gave validity to the execution of the power by the agents, and enforced the bond with interest. The only ground upon which interest could have been allowed was, that the creditor had an agent here, to whom payment could have been made. In the case of Monseax v. Urquhart, 19 Louis. R. 485, it was held that the agency was not “ dissolved or even suspended by the occurrence of the late war.” In Denniston v. Imbrie, 3 Wash. C. C. R. 396, 403, the court say: “The last question respects interest during the war. AVe think that if the alien enemy has an agent in the Hnited States, or if the plaintiff himself was in the Hnited States, and either of these facts known to the debtor, interest ought not to abate.” “ The debtor might have paid his debt, either to the creditor, or his agent in this country, without the danger of violating his duty or the laws of the land.” This case reaffirms the principle decided by the same court in Conn & als. v. Penn, &c., 1 Peters C. C. R. 496. The principle of these cases is settled by the highest court in the land, in the recent case of Ward v. Smith, *638 7 Wall. U. S. R. 447, 452. Mr. J. Field, delivering the opinion of the court, says: “The objection that the bonds did not draw interest, pending the civil war, is not tenable. The defendant, Ward, who purchased the land, was the principal debtor, and he resided within the lines of Union forces, and the bonds were there payable.” (The creditor lived within the Confederate lines.) “When an agent appointed to receive the money resides in the same jurisdiction with the debtor, the latter cannot justify his refusal to pay the demand, and of course the interest which it bears. It does not follow that the agent, if he receive the money, will violate the law by remitting it to his alien principal. ííor can the rule apply when one of several joint debtors resides in the same country with the creditor, or with the known agent of the creditor.”
These cases, and others which might be cited to the same effect, are not limited in their application to contracts wholly executed. And I am unable to perceive why it should not be applicable to our case as well as to an executed contract. The only acts to be done by the assured, were to pay money to the agent at stated periods; and the only thing to be done by the company, through their agent, was to give a receipt for the money so paid, until after the death of Wm. S. Warwick. And we have seen that, even in that event, it was not necessary for the assured to go out of the State to enforce his contract against the insurers for the policy even by suit. Row, it seems to me, that, if there is any difference between this case and an executed contract, it is in favor of this case; for these payments were not necessary to be made in discharge of debt; which could be done, and perhaps as well •done, after the war; but they were'necessary to be done in the performance of a condition, to prevent a forfeiture ; and the payments were made at the place where, *639 ■and to the agent to whom, the contract required them to he made.
As to the form of the receipt, and that it should be ■signed by an officer of the company, that was prescribed by the company, as the kind of evidence which it required of the payments. It could not change the law of the contract, which authorized payment to be made to the agent; and, I think I have shown, was not so intended. The obligation of the assured, by his contract, was to pay to the agent; and this requisition was not in conflict with that obligation. To say that the company could withhold these printed receipts ■on the day of payment, .would be to say that they •could refuse to receive payment, and thereby release themselves from the obligation of the policy, •and subject the assured to a forfeiture, without any default of his, of all the premiums he had paid: a conclusion against which the moral sense of mankind would revolt. I hold, then, if, on the day and place when and where payment was to be made, the assured offered to pay to the agent, who had not been provided with the printed receipts, the company will be presumed to have waived that requisition; and a payment to the agent, without them, would be good, and a sufficient compliance with the contract. >
But it is contended that, by the letter of May 30th, T861, the agency was revoked. I do not think so. On the contrary, it evidently recognizes a continuing • agency. It authorizes the agent to adjust difficulties as to policies, in a certain way, and requests, “ if this -does not meet your views, let us know what you would advise.” If the instruction must be construed, that 'the premium should be paid in New York city, and not in Richmond, I think it is clear that they had no right, under the contract, to impose such a condition. . And we find in their nest letter they say, “ must be paid here, or by draft on this city.” Again they say, *640 “ we wrote you on 30th May last,” &e.; “ renewals to be paid here, or by draft on this city.” And thus their agent seems to have understood their letter of 30th May. For he received payment of the premium on the 23d July, 1861, and on the same day wrote to them to send the printed receipt. And again, on the 5th of August following, he wrote to them: “I wrote you on the 23d ultimo, requesting you to send me the company’s printed receipt for Mr. Corbin Warwick’s premium on policy No. 4758, and have not heard from you; as soon as I get the receipt I ivitt make the remittance• to you.”
Whilst this company had no authority, under the-contract, to change the place of payment, they had undoubtedly the right to refuse payment in Confederate-money, and to require it to be made by draft on New York or in New York funds. This their agent was-, prepared to do. But in their letter of 6th of August, although they acknowledge that, in their letter of May 30th, they had authorized payment of the premium to-be made by draft on New York, they refused or failed to inclose the printed receipt. By neglecting or refusing to send the printed receipt to their agent as requested, they failed to receive the draft, which would have been remitted to them upon its receipt. And this being their last communication to him during the-war, he did not remit to them the draft, but held it until probably 1863, when it was taken from him under the sequestration act. It was the implied refusal of the company,.therefore, to receive payment from their agent in the mode prescribed by themselves, which prevented the remittance being made. And, if it is a loss to them, they have nobody to blame but themselves. It was certainly not the fault of the assured, who had honestly paid it in the kind of funds which they required: and it would be unjust to require him to pay it again.
*641 In all their correspondence with their agent, I do not find an intimation of a purpose to revoke his agency. And under the act of Assembly, which is to be read as a part of their contract, they could not, until they appointed another agent in his place. "Were they relieved from this obligation by the war? Or could their failure to have an agent here to receive payment of the premiums, release them from the obligation of the policy, or entitle them to a forfeiture ? It seems to me that both these questions must be answered in the negative. And that they could not avail themselves of their own disability for such a purpose. But they are questions which do not arise in this case, inasmuch as there had been no revocation of the agency of Macmurdo.
La their letters they express a disposition to act liberally towards their southern policy holders. In this they may have been sincei*e. But their failure to send the painted receipt to their agent, when requested, to enable him to remit to them a cheek upon New Yoi'k, as they required, in payment of the premium, which he infoamed them had been received, does aaot show a disposition to afford any facility to the assured to fulfil the condition of his policy. If the receipt had been sent and lost they could not have sustained any loss by its miscarriage. But the probability is, it would have reached its destination, as did their letters both ways, and that they would have received a draft from their faithful agent, on New York, for the premium. It is impossible to shut our eyes to the fact that the company was largely interested in defeating these policies; and considerations of that sort may have had more influence upon their conduct than a desire to promote the interests of their policy holders. I am well satisfied that, in this case, they might have received the premiums from the assured in New York funds, if they had been very desirous to receive them. At any *642 rate their agent, in receiving payment of the premium &r 1861, in a draft on New York, did not violate his instructions; and in refusing to receive that for 1862 at 'Richmond, if he acted under instructions, they were instructions which the company had no right to give. I am, therefore, of opinion to affirm the judgment.
Christian J.
In considering this case, and in seeking to arrive at a satisfactory solution of the novel and difficult questions which it presents, there is one thing which must he kept steadily in view; and that is, that this is an aekon, at law for the breach of a covenant rqjpn a contráckjn writing, under seal, in which the made-"their own agreement. It is not a case in which a‘party comes into a court of equity to ask relief against a forfeiture, but it is a case in which, in a court of law, the parties invoke the judicial interpretation of the contract which they have entered into, to ascertain their legal rights and liabilities. Ye are not ut liberty, therefore, to consider what peculiar hardship may result to either party from the legal effect of their own contract. But the sole question is, what is the nature of the contract which the parties have made for themselves, and what are their legal rights and liabilities under that contract, interpreted according to the .rules of law?
The record shews that the defendant in error, Cor-bin Warwick, effected a policy of insurance upon the .life of William Sidney Warwick for the sum of ten thousand dollars, with the plaintiff in error, the Manhattan Life Insurance Company.
Looking to the policy of insurance as fixing the terms of the contract between the parties, we find that the Manhattan Life Insurance company bound them- . ¡selves to assure the life of the said William Sidney Warwick, for the sum of ten thousand dollars, for the berm of his natural life, for the sole use of the said *643 'Corbin Warwick, in consideration of the “sum of one •thousand and thirty-one dollars to them in hand paid by Corbin Warwick, and of the annual premium of one thousand and thirty-one dollars, to be paid on or before the 23d day of July in every year during the •continuance of this policy.” It was further stipulated that “in case the said Corbin Warwick shall not pay the said premium, on or before the day hereinbefore mentioned for the payment thereof, the said company shall not be liable for the payment of the sum assured or any part thereof.” And it was further agreed by the assured, that “in every case, where this poliey shall cease, or become, or be null or void, all previous payments made thereon shall be forfeited to said company.”
Endorsed upon this policy of insurance, under the head of “notice,” and which is as much a part and parcel of the contract as if embodied in it (see 2 Philips on Insurance, § 2,014) are to be found the following stipulations, in addition to those already referred to: “The premiums are always due on the several days stipulated in the policy, and all risk to the company commences at the time of the actual payment of the first premium, without regard to the date of the poliey (unless otherwise stipulated in the policy), and continues until the day named in the policy for the payment of the next premium at 12 o’clock noon, and no longer; ” * * * “and no payment of premiums binding on the company unless the same is acknowledged by a printed receipt, signed by an officer of the company.”
It will thus plainly appear, by the express provisions of the policy itself (to which alone we can look to ascertain the agreement of the parties), that the Manhattan Life Insurance Company bound itself to assure the life of William Sidney Warwick, upon the express condilion that the annual premium should be paid on or before the day named in the policy; and expressly *644 stipulating that if the annual-premium was not sopaidT the company should not be liable for the sum assured, or-•any part thereof.
The annual premium was the consideration for the risk. The risk assumed by the company on the one hand, and the premiums paid by the assured, as the price of that risk, on the other, are correlative obligations whose mutual operation constitutes the very essence of contracts, of insurance. Marshall on Insurance, 648; Angel on Tire and Life Insurance, 461, § 399. Under this policy, the obligation of the assured was to pay the annual premiums to the company on the day specified, and that of the company was to assume the risk from the day of payment for twelve months from that day. These were the mutual and correlative obligations which the parties respectively assumed by their own written contract. The liability of the company is fixed only upon the condition that the annual premiums are paid on the day specified.. The breach of that condition (whether it be regarded, as a condition precedent or subsequent), by the express terms of the contract, discharges the company from all liability. The conditions imposed by the policy arise from the contract which the parties themselves, have made; they are not conditions imposed by law,, but by the express terms of the contract, and strict, performance of these conditions will be required before any liability can be fixed. It is plain that, looking-alone to the policy, as containing the contract of the parties, the obligations of the company cease upon the failure of the defendant in error to pay the annual premium on the day fixed in the policy for such payment. Ruse v. Mutual Life Ins. Co., 23 New York R. 516; Simpson v. The Accidental Death Ins. Co., 2 Com. Bench, N. S., 257; 1 Big. R. 578; Harmony v. Bingham, 12 New York, 2 Kern. R. 99; Wood v. Worsely, 2 H. Bl. R. 574, note 582.
*645 It is a well-settled principle of law, that the relative «claims and obligations of the parties are always fixed and determined by their own written contract. In Atkinson v. Ritchie, 10 East R. 533, Lord Ellenborough said: “The relative claims of the parties upon, and t-heir duties in respect of, each other, are conclusively fixed and defined by the terms of their own written contract. Ho exception, which is not contained in the •contract itself, can be engrafted upon it by implication, as an excuse for its non-performance. "When a party, by his own contract, creates a duty, or charge upon himself, he is bound to make it good if he may; notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract.” The principles thus announced in this case were recognized and approved by this court in the case of "The Merchants’ Ins. Co. v. Edmond, Davenport & Co.,” 17 Gratt. 146, 157. (See also Paradine v. Jane, Aleyn 27.)
The Manhattan Insurance Company was domiciled in the city of New York. The contract of the defen•dant in error was to pay his annual premiums to the •company. There was no stipulation in the policy which bound the company to keep an agent in the city •of Richmond. It is true, they did once have such agent in the person of one J. B. Macmurdo, through whom the policy of insurance in this case was at first -effected. But his powers, as agent, were expressly limited and defined by the terms of the policy, and «there was nothing in these terms which prevented the •company from revoking the agency at any time. The limitation referred to is found in the endorsement upon the policy, and is in these words:• “Ho payment of -premiums binding on the company unless the same is •acknowledged by a printed receipt signed by an officer •of the company.” The manifest object of this stipulation was to limit and control the power of their *646 agent, and to insure the receipt of the premiums, andi its plain effect was 'to notify all parties, dealing with ■ their agents, that they were authorized to receive the premiums only when they presented such a receipt as the notice required, to wit: a printed receipt, signed by an officer of the company. Payment to a party not presenting such a receipt, was a payment to one not authorized to receive it, and could not bind the company by the express terms of their contract. I have said the contract, on the part of the defendant in error, was to pay the premiums to the company. Of course, payment to its authorized agent was payment to the company; but here the agent was not authorized to receiye the premiums except upon certain conditions, which were well known to the assured, and were embodied in the very contract which he seeks to enforce.
I do not mean to say, that where the company prevents payment on the day specified by withholding a printed receipt, signed by an officer of the company, that it would be released from its obligation as insurer; for that would be a fraud upon the rights of the assured. But I refer to this stipulation for the purpose of shewing that the contract of the defendant in error was to pay the annual premiums to the company, which was-domiciled in the city of New York; and that, so far from there being any obligation to keep an agent in-the city of Richmond to receive premiums and give receipts for the same, the appellee had expressly stipulated, when he accepted the policy of insurance, that “ no payment of premiums should be binding on the company unless the same be acknowledged by a printed receipt signed by an officer of the company.”
In times of peace it was both convenient and profitable to the company to keep an agent in the city of Richmond, to solicit patronage and extend the business of the- company. It was convenient to the assured to pay the premiums here instead of New York. Ac *647 eordingly, we find that, up to the commencement of the late war, the premiums were regularly paid to J. B. Macmurdo, the agent of the company, hut in every case upon printed receipts signed "by an officer of the company, as stipulated in the policy. On the 23d day of July, 1861, after hostilities between the States had commenced, and when mail facilities had ceased between the two sections, the defendant in error paid to J. B. Macmurdo $1,031, the amount of the premium then due on his policy, and took his written receipt for the same, signed by him and not by an officer of the company; with the promise on the part of Macmurdo that he would write to New York and get the proper receipt. "Warwick called on Macmurdo several times to get this receipt, hut failed to do so. This money, so received by Macmurdo from "Warwick, he attempted to remit to the company in New York, by a draft purchased of R. H. Maury & Co., on Carpenter & Vermyle of New York; but the draft never reached the company, and it was afterwards paid by R. H. Maury & Co. to a receiver of the Confederate States, under their sequestration act. It further appears from the evidence that, some time before July, 1862, the precise time is not stated, Macmurdo informed "Warwick that he had received instructions from the company not to receive any more premiums; hut, on the 23d day of July, 1862, "Warwick tendered to Macmurdo funds sufficient to purchase a draft on New York (in the currency circulating there), for the sum of $1,031, the annual premium due on that day, which Macmurdo refused to receive.
Several letters are exhibited in evidence, written by the company to Macmurdo, in reply to letters received from him. In one of these letters, dated May 30th,
’61, the company wrote that “in consequence of a discontinuance of the mails, and the derangement of exchanges, as well as the depreciation of the currency” *648 they would require the premiums to be paid in New York, or if the assured should prefer, their policies ■ might be cancelled upon certain terms proposed. On the 6th day of August, 1861, they wrote another letter, from which the following extract is taken: “We are in receipt of your favor in reference to receiving the premiums on policies falling due, for which you have no renewal receipt, to which we cannot consent, as under the present state of things the premiums must be paid here, or by a draft on this city. We wrote you, on the 30th May last, that in consequence of the discontinuance of the mails, the derangement of exchange, and the depreciated currency, we would require the renewals to be paid here, or by draft on this city, &c. * * * In addition to this we now have 'the fact that the Southern Confederacy has passed an act declaring all property belonging to the Horth confiscated. You, will, therefore, see the impropriety and impossibility of this company receiving its premiums in your city.”
Here, then, we find, that as early as August, 1861, the agent had direct and positive instructions from the company not to receive any more premiums; and they, refuse to furnish him with the renewal receipts (printed and signed by an officer of the company), which, according to the express terms of the policy, known to all the policy holders, was the authority to him to receive the premiums, and thus they, in effect, revoked his power as their agent to receive them.
How, from what has been said, the following propositions are undoubtedly true, and cannot be gainsaid:
1st. The condition, upon which alone the company can be held liable, is the payment of the annual premiums on the days specified; and the breach of that condition, by .the express terms of their contract, discharges the company from all liability, and causes the policy, in its own language, to “cease and determine.”
*649 2nd. The contract of the assured was to pay the annual premiums to the company, which was domiciled in the city of New York. And
3rd. There was nothing in the contract which hound the company to keep an agent in the city of Richmond to receive the premiums and give renewal receipts.
It therefore follows, logically and inevitably, that the tender to Macmurdo, who was once the agent of the company, hut whose powers had been revoked, ■could not, in law, under their contract, fix any liability upon the company, unless it can he shewn that under some law or usage or statute, regulating policies of insurance in this State, the company was hound, both in time of war as well as in times of peace, to keep an agent here to receive the annual premiums when they fell due, upon the policies they had issued to persons resident in this State.
The counsel for the appellee insist, that the policy of ■our laws regulating foreign insurance companies is to put them on the same footing as home companies; that the provision in the policy, that it is “not binding on the company until countersigned by their agent here, makes the contract what they are pleased to call a •“ Virginia contract;” and great stress is laid upon the statute of this State regulating foreign insurance companies, which they insist imperatively requires every foreign insurance company to keep an agent here, ready to receive the premiums upon their policies as they become due; and they argue, with great plausibility, that though the policy is an insurance for the life of ¥m. Sidney Warwick, upon the express condition that the annual premiums shall he paid, yet that the defendant in error was prevented from paying the premiums by the failure of the company to provide a hand to receive them, and that thus the performance of the condition was defeated by the act of the com *650 pany; and that therefore they are not to be discharged!, of their liability to pay the insurance.
To meet this view of the case, it becomes necessary to refer to the statute law regulating foreign insurance-companies, and ascertain whether, upon a fair interpretation of this statute, the construction contended for can be maintained. It is found in the 39th chapter of' Code of 1860, sections 23 to 35 inclusive. The 23d section provides that no insurance company not incorporated by the Legislature of this Commonwealth,, shall make any contracts of insurance in this State until it shall have complied with the provisions of the act. “Section 24. Every such insurance company shall, by a written power of attorney, appoint some citizen of this Commonwealth, resident therein, who shall accept service of all lawful processes against such company in this Commonwealth, and cause an appearance to be entered in any action in like manner as if such corporation had existed and been duly served with process in this State.”
The 25th section makes provision for filing with the auditor a certified copy of such power of attorney. The 26th section requires the company to make a new appointment if such attorney or agent shall die, resign or be removed; and provides further, that such-power of attorney shall not be revoked until another competent person is appointed. Section 27 declares that service of process upon such attorney shall be deemed to be sufficient service upon his principal. Section 28 prescribes penalties upon an agent who acts for a company that “shall make insurance without complying with the requisitions of this act.”
The remaining sections provide for the making of the semi-annual returns to the auditor of “all premiums received and assessments collected” by agents of foreign insurance companies, and pay a certain tax into the treasury; require bond with security for the *651 true returns; and prescribe additional penalties for a failure to observe all the requirements of tbe act.
How, in all these sections there is not a line or word which imposes upon the company the obligation to keep an agent for the purpose of receiving the premiums upon their policies as they become due, or which requires the payment here instead of the place where the company has its domicil. The object of the statute is two-fold: first, to enable parties assured by foreign insurance companies to bring their suits in the courts of this State, instead of going before foreign tribunals to assert their rights; and therefore the law imposes a condition upon such companies, that they shall not engage in business in this State unless they keep an agent, as long as they have outstanding liar bilities, “who shall acknowledge service of process,” which shall be deemed sufficient service on his principal. And, second, to insure the punctual payment, into the treasury of the State, of all taxes assessed upon ■ such companies.
These, upon a fair interpretation of the statute referred to, are its leading and manifest objects. It would be a strained and unwarrantable construction to carry it to the extent for which it is invoked by the counsel for the appellee.
But, giving to this statute the most liberal and latitudinous construction, making it embrace objects which neither its language nor spirit indicates, can it be maintained that this statute, enacted in times of peace, applicable to times of peace, shall override the public and universal law of nations, and compel obedience even from alien enemies not within its jurisdiction? Could this statute compel the appellant to appoint an alien enemy to act as his agent in Virginia, or to keep an alien enemy as his agent, when, by the law of the Confederate States, which was admitted and recognized as the supreme* *652 law of Virginia, such, agent was hound to pay over every dollar belonging to his principal to the public sequestrator ? I think not. The refutation of such a proposition is found in its simple statement. It would bé a solecism in law and reason to say that the appellants should (though their ' contract did not require it, upon some vague and undefined notions of supposed hardship and injustice), be required to keep an agent in the enemy’s country to receive premiums due his principal, which it was his duty to remit or keep safely for his principal, but which he was required by the laws of the'belligerent State, under heavy penalties, to pay over to the public sequestrator.
And this view of the subject brings me to consider the important question, how far the contract between these parties was affected by the war between the two sections.
It is earnestly insisted, that such a contract as the one we have to deal with belongs to that class of contracts which are not abrogated, but only suspended, during the war. And in the view of the case presented by the counsel for the appellees, it hinges upon the solution of this question. War existed between the State of New York, where the appellants resided, and the State of Virginia, where the appellee resided, from June, 1861, to April, 1865 ; -during which-time the assured, Wm. S. Warwick, died. The question recurs, What was the effect of war upon such a contract? Was it simply suspended, or was it totally abrogated and annulled ? The numerous authorities referred to on both sides would seem to be conflicting; but that conflict is rather apparent than real; and, when critically examined and compared, are easily to be reconciled as referring to a different class of contracts. Cases like Buchanan v. Curry, 19 John. R. 137; Conn, &c. v. Penn & al., 1 Peters C. C. R. 524; Denniston v. Imbrie, 3 Wash. C. C. R. 396; Ward v. Smith, 7 Wall. *653 U. S. R. 447; and United States v. Grossmayer, 4 Id. 72, refer to cases where the contracts are executed, and nothing more is' required to be done to complete them; such as intercourse or negotiation between the parties. These cases decide that it is lawful for an alien enemy to keep an agent in the enemy’s country to receive money or to take care of his property during war. But they certainly do not go to the extent of saying that an alien enemy is obliged to keep an agent in the enemy’s country to keepxdive contracts, or even to receive money due him. But this class of cases, in my view of their scope and legal effect, simply go to this extent, that if the contract is of such a character that its continued existence is not dependent upon any further intercourse between the parties, or where no acts or negotiations between the parties are necessary to carry out or complete the objects of the contract, according to its terms; in such cases the contract is suspended during the war; and, upon a return of peace, the rights of the parties under their contract may be enforced. But it is equally well settled (by cases whose name is legion, and whose authority since the great leading case of Griswold v. Waddington, 16 John., 438, has never been questioned in ahy court) that, where the contract is of such a character that its continued existence and obligation require and depend upon acts to be done by or between the parties, during the war, then such contract is abrogated and annulled by the breaking out of the war ; for, in the language of Judge Story, in the case of the Julia, 8 Cranch R. 181,194, “ it is a fundamental proposition, that in war all intercourse between the citizens and subjects of the belligerent countries is illegal, unless sanctioned by the authority of the government, or in the exercise of the rights of humanity.”
It seems to me that in this day of enlightened international jurisprudence, no principle of international law is more firmly established than that the declaration *654 of war arrests all intercourse between belligerents. War puts every individual of tbe respective governments as well as tbe governments themselves, in a s^e hostility to each other. There is no such thing as a war for arms and a peace for commerce. The existence of civil contracts and relations is contradictory to a state of war. Sir William Scott, one of the most profound jurists of his age, repeatedly declared in numerous cases adjudged by him, that a state of war was a state of interdiction of all communication. The remittance of money for any purpose, the acceptance of trusts, the creation of any civil obligation whatever, is unlawful and forbidden. The belligerent governments have placed their respective citizens in an attitude of hostility towards each other, and no relation inconsistent with hostility can be lawfully created by the acts of individuals. Lawrence’s Wheaton 556, 557, note, and eases there cited. Li the case of The Rapid, 8 Cranch. R. 155, 161, Judge Johnson uses the following emphatic language: “ The universal sense of nations has acknowledged the demoralizing effect that would result from the admission of individual intercourse between belligerents. The whole nation is embarked in one common bottom, and must be reconciled to one common fate. Every individual of one nation must acknowledge every individual of the other nation as his enemy, and the enemy of his country.” In the case of the Julia before cited, Judge Story says: “Independent of all authority, it would seem a necessary result of a state of war to suspend all negotiations or intercourse between the subjects of belligerent nations.” In the leading case of Griswold v. Waddington (supra), Chancellor Kent, reviewing all the English and American cases, in an opinion which is universally recognized as a masterpiece of legal learning and judicial eloquence, uses the following language: “Here, then, we have the final consumiría *655 tion of this discussion, and the sanction of the doetrine we have been tracing, solemnly given by the highest judicial authority of the United States. It reaches to all interchange, transfer or removal of property, to all negotiations or contracts, to all communication, to all locomotive intercourse, to a state of utter occlusion, to any intercourse but one of open hostility, to any meeting but in actual combat.” See also 18 How. U. S. R. 110; 90 Eng. Com. Law R. 736; 7 Peters R. 586; Law. Wheaton 556; 1 Gallison R. 295; Ib. 248; 6 Wall. U. S. R. 536.
Mr. Duer, in his work on Insurance, referring to the case of Griswold v. Waddington, 16 John. R. 438, says: “The propriety of this decision, as applied to a commercial partnership, that from its nature supposes and requires a frequent intercourse and communication, •cannot be disputed. There are, doubtless, contracts of which war suspends the existence, without dissolving the obligation.” “The distinction,” says Mr. Duer, “ is probably this: a vested right, under a subsisting -contract, is not affected by a subsequent war; but where the contract is executory, and would have been illegal if made in time of war, it becomes so from the time that hostilities commence as to all acts to be performed by either party during the war.” Duer on Insurance, vol. 1, p. 478; Hosack Rights of Neutrals p. 83; Hanger v. Abbott, 6 Wall. U. S. R. 532. In the last named case, the court says, that “ executwy contracts with an alien enemy, or even with a neutral, if ■ they cannot be performed except in the way of commercial intercourse with the enemy, are dissolved by the declaration of war.”
The policy under consideration was clearly executory. The vital principle and spirit of the contract is the payment of the annual premium by the appellees, and •the consequent liability of the company, in the event *656 that Vm, S. "Warwick should die during the year for which the premium had been paid. The continued existence of the policy depended upon the punctual payment every year by the appellee; and, by its express terms, no obligation whatever was imposed upon the appellants until the premium was paid. In this' respect the contract was certainly executory, and its continued existence absolutely demanded continued intercourse and dealings between the parties; so that this contract is brought within the very definition of the authorities-, as an executory contract. It is no answer to say that these premiums might be paid to an agent here without intercourse with the belligerent country. I have-already shown that the powers of Maemurdo had been revoked, and also that there was no law or usage or-statute which required the company to keep an agent here, nor did their contract compel them to keep such agent.
But it is said the hardship of this case is peculiar,, remediless, operating (if the views here taken prevail) as a forfeiture of upwards of five thousand dollars actually paid in the shape of premiums to the company;- and it is earnestly and eloquently pressed in argument that the very right and justice of the case requires a. different adjudication. The answer is, the parties have-made their own contract, and that they are now in a court of law seeking their legal rights and legal remedies. The large sum which the appellee has paid he has received a legal and valid consideration for, it being according to the terms of his contract, the risk of' the life of the assured carried during that time by the-company. If the judgment of a court of law, refusing-to fix any liability upon the appellant would seem to be harsh and inequitable, it is because it is the enforcement of a legal right, operating oppressively, it may be, in a particular case, but against which it is impos *657 sible to afford relief, without substituting the undefined, and therefore dangerous, discretion of a court, for the fixed and immutable, principles upon which the law in relation to contracts should be administered.
My opinion is that the judgment should be reversed.
Joynes and Staples J’s concurred in affirming the judgment.
Moncure, P., concurred in the opinion of Christian J.
Judgment arrirmed.