IRA W. BLOUGH, Administrator, Appellant, v. CHICAGO
GREAT WESTERN RAILROAD COMPANY et al., Appellees.

**NUISANCE:** Nonattractive Nuisance—Artificial Pond. An *ordi-*
    *nary* pond of water, unguarded and unfenced, within the cor-
    porate limits of a city, and entirely within a railway right of
    way, and formed by natural drainage from surrounding land,
    which settled into a barrow pit, and around which children
    habitually played, is not an attractive nuisance, in such sense
    as to render the railway company liable in damages because an
    immature child met death by falling therein.

*Appeal from Black Hawk District Court.*—GEORGE W.
DUNHAM, Judge.

· NOVEMBER 16, 1920.

ACTION for damages consequent upon the drowning of
Velma Leona Gregson, resulted in a directed verdict for

defendant and judgment thereon. Plaintiff appeals.—
*Affirmed.*

J. C. *Beem,* and H. E. *Tullar,* for appellant.

*Carr, Carr & Cox,* and *James G. Clark,* for appellees.

LADD, J.—Shortly after 2 o'clock in the afternoon of
March 29, 1919, Velma Leona Gregson, aged 5 years, wan-
dered from home, and was drowned in a pond or barrow
pit situated entirely in the right of way of the Chicago
Great Western Railroad Company, and within the corpo-
rate limits of the city of Waterloo. This pond is said by
witnesses called by plaintiff to have been from 200 to 300
feet long, 3 to 4 feet deep, and 9 to 12 feet wide, with steep
banks on the side opposite the railroad. A ten-inch tile
drains about 40 or 50 acres of land, including a cemetery,
down the hillside into the west end of this pond. A con-
siderably traveled pathway extends from this drain around
the end onto the railroad. The surrounding land is low.
There is a natural drainage from the pond under the rail-
road bridge close to it, and on to Black Hawk Creek, about
75 yards distant, through a ditch about a foot wide and a
few inches deep. Another company had built a dam in this
creek. The surface water of the pond is about 8 inches
higher than that of the creek, and, but for the tile drain,
the water might be carried from the pond within a few
inches of the bottom. According to an engineer, the
bottom of the pond was but 5 or 6 inches below the outlet,
and the fall from the bottom of the barrow pit to the
bridge, 6 inches, and a foot from there to the bottom of the
creek. The nearest city street is about 65 feet from the
mouth of the drain, and it is three blocks distant from the
paving. There was no fence or other guard about the pond.
Children habitually played about the pond. At the time
in question, the water overran the path.

Such were the facts on which the trial court based its

denial of recovery. The doctrine of the so-called turn-table cases is relied on to reverse this ruling. See *Edgington v. Burlington, C. R. & N. R. Co.,* 116 Iowa 410. We do not regard it as applicable. It may be conceded that the pond was attractive to children. So are all bodies of water. The trouble with the case is that there was nothing about this pond to render it more attractive or to enhance the danger over the attractions or dangers of natural bodies or streams of water, such lakes, ponds, and streams being scattered over the country nearly everywhere. Counsel have not cited, nor have we been able to find, any authority for adjudging a landowner responsible for loss of the life of a child from drowning in a natural pond, lake, or stream situated on his lot or tract of land, or in an artificial pond or stream therein existing, like those created in the course of nature. In *Price v. Atchison Water Co.,* 58 Kan. 551 (62 Am. St. 625), the defendant company maintained two water reservoirs on its premises in the immediate proximity of the residence part of the city of Atchison, one having a capacity of 1,100,000 gallons, and the other about 3,000,000 gallons. The smaller one was used as a settling basin into which the water was pumped, and from which it was discharged into the larger reservoir through a pipe. The opening of this pipe into the larger basin was covered with an apron made of lumber, and designed to protect the walls of the reservoir. It was partially buoyed by the water, and rose and fell as the water supply increased or diminished. For 4 feet from the top, the walls of the smaller reservoir were perpendicular, and thence slanted to the bottom, its basin being about 10 feet in depth at the deepest part. The walls of the larger reservoir slanted at an angle of about 45 degrees, and its basin had a depth, at its lowest part, of about 15 feet. It would have been difficult, if not impossible, for a person falling into the larger basin to get out unaided, on account of the steepness of the walls. These reservoirs were shown to have been attractive to children, for the purpose of fishing and other sports. Though the ground was fenced, the children

gained ready access over the stiles, as they were permitted
to do. One of the sons of plaintiff, 11 years of age, ventured
upon the apron above described, for the purpose of cross-
ing from one part of the reservoir wall to another. The
end which projected out upon the water sank, precipitat-
ing him into the basin, and he was drowned. Plaintiffs
were adjudged entitled to recover, and rightly so, because
of the entirely artificial character of the receptacle, with
the apron and its motion rendering the place peculiarly at-
tractive. In *City of Kansas City v. Siese,* 71 Kan. 283 (80
Pac. 626), a pond had been formed by placing a fill in the
street across a deep ravine. An alley of the city crossed
this pond. A sewer was placed in the alley by the city,
and a sewer was built over and across the pond, resting
in a trough, supported by piling. This sort of viaduct was
attractive and alluring to boys, who for a long time had
resorted to the place, and climbing along this pipe and
trough, jumped into the water below. The artificial struc-
ture built over the pond was the most attractive feature
of the place, and recovery was approved; though one of
the judges dissented. These cases, as explained by John-
son, C. J., in *Tavis v. City of Kansas City,* 89 Kan. 547,
are not out of harmony with the rule as applied to natural
bodies of water. In *City of Pekin v. McMahon,* 154 Ill.
141 (45 Am. St. 114), it appears that the city owned 4 lots
in a certain block, bounded on the west and south by public
streets, and on the north by an alley. These lots were in a
thickly settled part of the city. Gravel had been excavated
therefrom, about 200 feet long and 100 feet wide, leaving
the banks steep; and there was a triangular tract to the
north. Water had accumulated to the depth of 14 feet.
The fence around the property was out of repair, and was
open for 30 feet at one place and 40 feet at another, through
which teams were driven. Numerous logs and planks were
floating on the water, on which the boys had been in the
habit of playing, as the defendant well knew. The decedent,
a boy of 8 years, so playing, stepped upon a log in the water,
and it rolled over, and threw him into the pond, in con-

sequence of which he lost his life. The court, in upholding recovery, observed that:

"The place where he was seen playing in the water was only a few feet from this opening on the public alley. The love of motion, which attracts a child to play upon a revolving turntable, will also attract him to experiment with a floating plank or log which he finds in a pond within his easy reach."

In *Brinkley Car Co. v. Cooper*, 60 Ark. 545 (46 Am. St. 216), boiling water was let from a boiler into a pit, forming a pool on its premises about 60 feet distant from its mill, and 300 feet from the nearest street, and in it defendant deposited pieces of bark from logs or timber brought to its yards, and these congregated and floated on the water so thickly that persons approaching or passing could not see the top of the boiling water; and, of course, defendant was held responsible for the dangerous trap set in its premises.

These decisions are frequently pointed out as being in conflict with the general current of authority denying liability for injuries suffered by children from playing about ordinary ponds or streams. An analysis of them indicates very plainly that in each there was some artificial feature other than the mere water and its location, rendering the place peculiarly dangerous to children,—the floating apron in the reservoir, in *Price v. Atchison Water Co.*, supra; the sewer trough on piles, in *City of Kansas City v. Siese*, supra; the floating logs and planks, in *City of Pekin v. McMahon*, supra; and the bark concealing the water, in *Brinkley Car Co. v. Cooper*, supra. In the absence of anything indicating something done by the landowner, calculated to render the pond attractive to children,—something more than of water in its natural state, or more alluring to danger than ordinarily attends playing in its vicinity,—the doctrine of the turntable cases has never been, and ought not to be, applied. In the leading case of *Peters v. Bowman*, 115 Cal. 345 (56 Am. St. 106), the grading of a street prevented the flow of surface water from defendant's lot in San Francisco, and this water, being stopped, formed a pond

in the rainy season, and during the dry season, the water would disappear. Boys were attracted by the water; and decedent, about 11 years of age, while floating with another boy on a rudely constructed raft of railway ties, ran along the ties, fell off, and was drowned. In the course of his opinion, McFarland, J., observing the contention of appellant that the reasoning and philosophy of the turntable cases applied, declared that:

"The same reasoning does not apply to both sets of cases. A body of water, either standing, as in ponds and lakes, or running, as in rivers and creeks, or ebbing and flowing, as on the shores of seas and bays, is a natural object, incident to all countries which are not deserts. Such a body of water may be found in or close to nearly every city or town in the land; the danger of drowning in it is an apparent, open danger, the knowledge of which is common to all; and there is no just view, consistent with recognized rights of property owners, which would compel one owning land upon which such water, or part of it, stands or flows, to fill it up, or surround it with an impenetrable wall."

Recovery was denied. In overruling a petition for rehearing, the court, speaking through Beatty, C. J., handed down a very illuminating opinion, from which we quote:

"A turntable is not only a danger specially created by the act of the owner, but it is a danger of a different kind to those which exist in the order of nature. A pond, although artificially created, is in no wise different from those natural ponds and streams which exist everywhere, and which involve the same dangers and present the same appearance and the same attractions to children. A turntable can be rendered absolutely safe, without destroying or materially impairing its usefulness, by simply locking it. A pond cannot be rendered inaccessible to boys by any ordinary means. Certainly, no ordinary fence around the lot upon which a pond is situated would answer the purpose; and, therefore, to make it safe, it must either be filled or drained, or, in other words, destroyed. But ponds

are always useful, and often necessary, and, where they do not exist naturally, must be created, in order to store water for stock, and for domestic purposes, irrigation, etc.  Are we to hold that every owner of a pond or reservoir is liable in damages for any child that comes .uninvited upon his premises and happens to fall in the water and drown?  If so, then, upon the same principle,, must the owner of a fruit tree be held liable for the death or injury of a child who, attracted by the fruit, climbs into the branches and falls out.  But this, we imagine, is an absurdity, for which no one would contend, and it proves that the rule of the turntable cases does not rest upon a principle so broad and of such rigid application as counsel supposes.  The owner of a thing dangerous and attractive to children is not always and universally liable for an · injury to a child tempted by the attraction.  His liability bears a relation to the character of the thing, whether natural and common or artificial and uncommon, to the comparative ease or difficulty of preventing the danger without destroying or impairing the usefulness of the thing, and, in short, to the reasonableness and propriety of his own conduct, in view of all surrounding circumstances and conditions.  As to common dangers, existing in the order of nature, it is the duty of parents to guard and warn their children,, and, failing to do so, they should not expect to hold others responsible for their own want of care.  But, with respect to dangers specially created by the act of the owner, novel in character, attractive and dangerous to children, easily guarded and rendered safe, the rule is, as it ought to be, different; and such is the rule of the turntable cases, of the lumber-pile cases, and others of a similar character."  .

This decision is quite generally cited with approval, and is in accordance with the authorities generally.  *Charvoz v. Salt Lake City*, 42 Utah 455 (45 L. R. A. [N. S.] 652) ; *Thompson v. Illinois Cent. R. Co.*, 105 Miss. 636 (47 L. R. A. [N. S.] 1101), where the court observed that:

"Scattered over the length and breadth of the land are innumerable ponds and lakes, artificial and natural; and

occasionally a boy or man loses his life while wading or bathing in such body of water. If, as a matter of law, the owners of fish ponds, mill ponds, gin ponds, and other artificial bodies, wherein it is possible that boys may be drowned, can be held guilty of actionable negligence unless they inclose or guard same, few will be able to maintain these utilities, and to our minds an intolerable condition will be created."

See *Gillespie v. McGowan*, 100 Pa. St. 144 (45 Am. R. 365); *Sullivan v. Huidekoper*, 27 App. D. C. 154 (5 L. R. A. [N. S.] 263); *Stendal v. Boyd*, 73 Minn. 53 (72 Am. St. 597, 42 L. R. A. 288); *Klix v. Nieman*, 68 Wis. 271 (60 Am. R. 854); *Richards v. Connell*, 45 Neb. 467; and *Barnhart v. Chicago, M. & St. P. R. Co.*, 89 Wash. 304 (154 Pac. 441), where the court said in the course of its opinion:

"The question here presented is not whether the owner of property may be liable: (a) By reason of a trap or pitfall upon his property which may produce the death or injury; (b) a hidden or concealed danger; or (c) a dangerous agency in close proximity or so near a highway that in the use of the highway an accident may occur,—but is whether a pond of water is a dangerous agency, such as will subject the owner of the property to liability for damages for the death of a child of tender years, attracted to the pond for the purpose of play. The turntable doctrine makes the owner liable because the dangerous agency was attractive to children of tender years, and in playing about or with such agency, accident or injury would probably result. That a pond of water is attractive to boys for the purposes of play, swimming, and fishing, no one will deny. But its being an attractive agency is not sufficient to subject the owner to liability. It must be an agency such as is likely to or will probably result in injury to those attracted to it. That many boys every year lose their lives by drowning is a matter of common knowledge. But the number of deaths in comparison to the total number of boys that visit ponds, lakes, or streams for purposes of play, swimming, and fishing, is comparatively small. It

would be extending the doctrine too far to hold that a pond of water is an attractive nuisance, and therefore comes within the turntable cases."

Most of the decisions are collected in notes to the above cases, and many will be found in a note to *Wheeling & L. E. R. Co. v. Harvey,* 19 L. R. A. (N. S.), beginning at page 1143. As the pond was not other than a mere barrow pit, common wherever railroads have been constructed, without characteristics different from natural collections of water in small ponds, and without additional attraction or enhancement of danger, the court rightly denied recovery.—*Affirmed.*

WEAVER, C. J., STEVENS and ARTHUR, JJ., concur.