VINCENT et al. v. BARNHILL et al.

(In Banc. March 22, 1948. Suggestion of Error Overruled April 26, 1948.)

[34 So. (2d) 363. No. 36726.]

Snow & Covington, of Meridian, for appellants.

742

Gillespie, Minniece & Nettles, of Meridian, for appel-
lees.

744

Argued orally by **E. L. Snow,** for appellants, and by **Tom Minniece,** for appellees.

**L. A. Smith, Sr.,** delivered the opinion of the court.

An action was brought in the Circuit Court of Lauderdale County by the heirs of Billie Mitchell Barnhill, demanding damages for his death by drowning in an old vat which had been built in connection with a former bleaching plant, long since out of business, and its buildings torn down. The location was in the outskirts of Meridian, in a field of approximately six acres. On a different part of this field, children were accustomed frequently to play baseball. Occasionally some diverted themselves around this vat, in which was impounded rain and surface water.

Certain concrete vats, including the one in this lawsuit, and concrete foundations for boilers and engines, relics of the old factory, were on the lot when appellants bought it a few years ago, and had been there for a long period of time prior thereto. They were retained by appellants as a possible incentive to potential purchasers of the premises for factory purposes. The vats were all visible from a highway skirting the property. They were

not hidden, or secret, and none could be classed as a concealed trap.

Billie Mitchell Barnhill was a small, intelligent boy of approximately seven years of age, when on the afternoon of March 27, 1947, he was discovered drowned in the vat here involved. How he came to be there, no one knew. He was alone, and had been repeatedly warned both by his mother and his older brother to stay away from the vats, including the one at issue here. In addition, he was known to be afraid of water, and would not wade beyond very shallow depths, even with others present. He had never been known to enter this pool. It does not appear that a path led by the place on his way home, and even if there had been, appellants had never consented to the entry of, or passage through, or playing in, these premises by him or other children. He was a trespasser there.

The vat in this case was about 35 feet long, 8 feet wide and 5 feet in depth. The concrete sides all around were only a few inches above the ground and that the vat contained water up to within a foot of the top of the sides could be seen for a distance of 50 feet away or more. As stated, there was nothing concealed about the vat, and it was utterly without any features of complication.

In many of these cases the Courts have noticed that some boys every year lose their lives by drowning in ponds and the like, but that the number so losing their lives is insignificant in comparison with the number of those who visit and play around or in such places. This is to say that while such drownings are a possibility they are not within the field of probability or likelihood, and our Court is committed to the rule that no man is to be convicted of negligence when or because he has failed to guard against that which is merely possible as distinguished from that which is likely to occur or is probable, as sometimes phrased. Here, this vat had existed for many years before appellants bought the land, and nothing in this record presents any evidence of prior trouble there, and this condition existed on the day of the tragedy

as it had, apparently without similar mishap, during all the long previous time of existence. This subject was fully discussed in Mauney v. Gulf Refining Co., 193 Miss. 421, 8 So. (2d) 249, 9 So. (2d) 780, and it is necessary only to apply the principle reviewed in that case to hold that there is no liability in this case.

At the common-law, there would be no liability under the circumstances of this case, and although the trespasser was a child, he was subject to the rule governing trespasses on land, the same as an adult. Liability, however, was sought to be fixed here by the application of the attractive nuisance doctrine, and by the so-called playground rule, both exceptions to the general rule. The latter rule is announced by the Pennsylvania Court in Kay v. Pennsylvania Railroad Company, 65 Pa. 269, 3 Am. Rep. 628. However, the Pennsylvania Court in Thompson v. Baltimore & Ohio R. Co., 218 Pa. 444, 451, 67 A. 768, 770, 19 L. R. A. (N. S.) 1162, 120 Am. St. Rep. 897, 11 Ann. Cas. 894, speaking of the attractive nuisance exception, said: ''The doctrine is a sweeping innovation on the settled common-law rule that a landowner is not liable for the condition of his premises to one who enters them without permission. We are of opinion that it is not sound in principle, and that it cannot be sustained.'' We have no decisions in this jurisdiction on the so-called playground rule, but we do have on the doctrine of attractive nuisance. We have adopted it in our jurisprudence along the line of the turntable cases. But, about it we have said: ''This doctrine has been repudiated by a majority of the courts, and 'needs very careful statement not to make an unjust and impracticable requirement.' United Zinc & Chemical Co. v. Britt, 258 U. S. 268, 42 S. Ct. 299, 66 L. Ed. 615, 36 A. L. R. 28. The tendency of the courts recognizing it is to limit, instead of enlarge, the scope thereof.'' Lucas v. Hammond, 150 Miss. 369, 116 So. 536, 60 A. L. R. 1427.

This attitude of our Court is in harmony with the following observation in 45 C. J., Sec. 188 (19), Negligence,

p. 784: ''Even in jurisdictions where the attractive nuisance doctrine has been accepted, the tendency is to limit rather than to extend it, and the doctrine is said to be one which should be applied very cautiously and only when the facts come strictly and fully within the rule.'' Those states which have rejected it, or refused to apply it, have acted on the ground that ''it has its foundation on the sympathy rather than on any sound principle of law, impairs property rights, imposes on every member of the community a higher duty for the protection of children than is imposed on their parents, and if carried to its logical conclusion would amount to practical insurance of children and make the ownership of property unduly unsafe, if not intolerable, or at least amount to a wide and dangerous extension of the liability attendant upon the ownership of property.'' Section 189 (20), 45 C. J., Negligence, p. 785. By this quotation, we are not to be understood as receding from our former decisions as to attractive nuisances, but in this connection, it is interesting to compare the foregoing language with the views of this Court in Bonhomie & H. S. Ry. Co. v. Hinton et al., 155 Miss. 173, 124 So. 271, approving by quotation from 45 C. J. 765, 766, the following:

''While it is necessary to the applicability of the doctrine now under discussion that the instrumentality or condition involved in the particular case should be attractive to children as well as dangerous to them, a statement that any agency which is dangerous and attractive to children may constitute an attractive nuisance is entirely too broad, and leads to absurdities, for there is practically no limit to what may attract children. It is manifest that many things ordinarily in existence and use throughout the country are both attractive and dangerous to children, and to hold that such things amount to an implied invitation to enter would be contrary to reason, lead to vexatious and oppressive litigation, and imposes upon property owners such a burden of vigilance and care as would materially impair the value of prop-

erty and seriously cripple the business of the country. Accordingly, it is usually considered that in order that the doctrine may properly be applicable, the condition or appliance must be something unusual and which is of a nature rendering it peculiarly or unusually attractive or alluring to children.''

Although we have elected to align ourselves with that group of states which has adopted the attractive nuisance doctrine, we have declared our tendency to limit rather than to expand its application. The doctrine, as stated, grew out of railroad turntable cases, while here, we have a pool or pond. Webster's New International Dictionary defines ''pond'' as ''a body of water naturally or artificially confined, and smaller than a lake.'' The same authority defines ''pool'' as a ''small body of standing or stagnant water.'' In the case of Thompson v. Illinois Cent. R. Company, 105 Miss. 636, 63 So. 185, 186, 47 L. R. A. (N. S.) 1101, this Court said: ''Of course, one could have anticipated the possibility of this sad event; but we think the danger was comparatively remote. Scattered over the length and breadth of the land are innumerable ponds and lakes, artificial and natural; and occasionally a boy or man loses his life while wading, or bathing, in such body of water. If, as a matter of law, the owners of fish ponds, mill ponds, gin ponds, and other artificial bodies, wherein it is possible that boys may be drowned, can be held guilty of actionable negligence unless they inclose or guard same, few will be able to maintain these utilities, and to our minds an intolerable condition will be created.'' It is to be borne in mind that in the Thompson case the nine-year-old child who was drowned had no knowledge of a deep ''step-off'' in which he lost his life in otherwise shallow water, and had not been warned of the hidden danger. In the case at bar, this seven-year-old, intelligent little fellow knew all about this pool, and had had its danger pointed out to him with frequent warnings to stay away. While there are some differences in the two cases, we take it that the Court in the Thompson case re-

fused to extend the doctrine of attractive nuisance to impounded water. We think that view is proper, unless extraordinary circumstances, such as are not here present, make, by its own peculiar facts, an exception to the generally accepted rule that pools and ponds are not ordinarily to be treated as attractive nuisances.

The Iowa Court in Blough v. Chicago Great Western R. Company, 189 Iowa 1256, 179 N. W. 840, 843, quoting from Barnhart v. Chicago M. & St. P. R. Co., 89 Wash. 304, 154 P. 441, L. R. A. 1916D, 443, said: "The question here presented is not whether the owner of the property may be liable: (a) By reason of a trap or pitfall upon his property which may produce the death or injury; (b) a hidden or concealed danger; or (c) a dangerous agency in close proximity, or so near a highway that in the use of the highway an accident may occur—but is whether a pond of water is a dangerous agency such as will subject the owner of the property to liability for damages for the death of a child of tender years, attracted to the pond for the purpose of play. The turntable doctrine makes the owner liable because the dangerous agency was attractive to children of tender years, and in playing about or with such agency accident or injury would probably result. That a pond of water is attractive to boys for the purpose of play, swimming, and fishing no one will deny. But its being an attractive agency is not sufficient to subject the owner to liability. It must be an agency such as is likely, or will probably, result in injury to those attracted to it. That many boys every year lost their lives by drowning is a matter of common knowledge. But the number of deaths in comparison to the total number of boys that visit ponds, lakes, or streams for purpose of play, swimming, and fishing is comparatively small. It would be extending the doctrine too far to hold that a pond of water is an attractive nuisance, and therefore comes within the turntable cases." The great weight of the authority supports the foregoing announcement by the Iowa Court.

We do not feel warranted under the evidence in this case to expand the doctrine of attractive nuisance to include the pond or pool here involved, or to impose liability upon appellants for the sad and pitiful death of this little boy; or to import into our jurisdiction any further exception to the general common law of negligence, such as the so-called playground rule. However, it is closely related to, if, indeed, it has any appreciable, substantial difference from, the turntable cases.

The jury awarded appellees a verdict of $12,500 in their suit for $25,000 damages, which the trial judge, by remittitur, cut down to $6,500, to which action of the court appellees did not except, but acquiesced therein. There was no conflict in the evidence, appellants, relying upon their contention that appellees had failed to make out a case, presented no witnesses, although the plaintiff introduced both appellants as adverse witnesses. Proper motion for a new trial was filed and overruled. The two assignments of error before us are that the court below erred in overruling this motion, and in refusing a peremptory instruction and a directed verdict in favor of appellants, defendants below.

We are of the opinion that the trial court did err in such rulings, and that appellants should have had a directed verdict. We therefore reverse the circuit court judgment, and enter judgment here for appellants.

Reversed and judgment here for appellants.