Roberta **HOWARD**, Appellant,

v.

**ATLANTIC COAST LINE RAILROAD COMPANY**, Appellee.

No. 15682.

United States Court of Appeals
Fifth Circuit.

April 6, 1956.

Nathan Bedell, Chester Bedell, Jacksonville, Fla., for appellant.

Charles Cook Howell, Jr., Charles Cook Howell, Howell & Kirby, Jacksonville, Fla., for appellee.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal from a judgment for the defendant entered notwithstanding a $7,000 jury verdict returned for the plaintiff. The sole question for our determination is whether the evidence, con-

sidered in the light most favorable to the plaintiff, is sufficient to warrant a finding of liability on the railroad's part for the death of the plaintiff's five-year-old son, under the Florida law of attractive nuisance.

At the trial, it was shown that on April 11, 1954, the plaintiff's three sons, aged 11, 9 and 5, respectively, went to their uncle's house, in Jacksonville, about three blocks from the railroad property in question. In the afternoon, the boys' sister, who was also visiting at the house, decided to walk to the church in the neighborhood. They accompanied her for a distance, and after parting with her, continued walking until they discovered some blackberries, on the east side of the railroad's tracks. They picked these for a time, and then proceeded further on the railroad's property, under a nearby trestle. There are "No Trespassing" signs near each end of the trestle, but the boys did not see them.

After they passed under the trestle and came out on the west side of the tracks, they observed several other boys swimming in a pit, or well, about thirty feet from the trestle in an adjacent vacant lot owned by the railroad. The well, formerly utilized to furnish water for steam locomotives, was twenty feet long and twenty feet wide, and nine feet seven inches deep. The lot was marshy, and overgrown with bushes and weeds, but the latter had been beaten down sufficiently by constant intrusions to make a path leading to the well. John, the youngest, asked his oldest brother if he could swim in the well. While the older boy found a long stick and was about to test the depth of the well with it, John took off his clothes and stood close by. In measuring the depth of the well with the stick, the older boy accidentally struck John with his elbow, and caused him to fall into the well. The other boys were unable to rescue him, and by the time firemen could be summoned, he had drowned.

The well in question was one of 65 such wells abandoned by the railroad's southern division in the period 1951 through 1954, after it adopted the use of Diesel locomotives exclusively. It therefore served no useful purpose for the railroad, and was boarded over by the railroad's employees, the boards being nailed to the wooden sides of the well. In 1953 and 1954, in the spring, railroad employees discovered boys swimming in the well, they having pried the boards off. The employees ordered them to leave, and replaced the boards. These efforts at exclusion were ineffective, however, for the boys continued to swim in the well, and in the spring of 1954, one boy went swimming in the well eleven times, without once seeing the cover on the well, although the boards were nearby.

On Wednesday, April 7, 1954—four days before the plaintiff's son was drowned—G. L. Cox, a roadmaster on the railroad, received a report that boys were swimming in the well. He investigated personally, and found the boards torn off the well and arranged so as to make a diving board. On the theory that the boys were swimming naked in the well with the bushes for cover, he ordered the bushes cut the following day, thinking that this would stop them. This was done. He went back that evening and found about five boys swimming in the well. He told them that they wouldn't be allowed to swim there any more, but they resumed swimming as soon as he started to leave. On Friday he went to a section gang which was using a bulldozer to level some land, and ordered them to load the bulldozer on a flat car before they quit work that day. These orders were followed, and the flat car was spotted at the site of the well on Saturday morning, in preparation for the well's being filled in on Monday. On Sunday, Cox returned to the well at noon, and found no one swimming there. Later that afternoon the plaintiff's son was drowned in the well, and the well was filled in on Tuesday, after the railroad's legal department had finished its investigation.

■ The parties agree that under Florida law the general rule is that the

owner of an artificial body of water is not guilty of actionable negligence for drownings therein unless it is so constructed as to constitute a trap or unless there is some unusual element of danger lurking about it not existent in ponds generally. Lomas v. West Palm Beach Water Co., Fla., 57 So.2d 881; Newby v. West Palm Beach Water Co., Fla., 47 So. 2d 527; Allen v. William P. McDonald Corp., Fla., 42 So.2d 706. The plaintiff contends that the unusual element of danger lurking about the railroad's well in this case is the straight decline of the sides of the pool to a depth of nearly ten feet. Thus, the argument proceeds, an unwary child who might enter the well with the idea of wading out a short distance into it would step immediately into such a depth of water that he could not recover himself.

The proposition is difficult to sustain in the light of the facts of this case, which show that the plaintiff's son did not meet his death by the type of youthful indifference to danger just described, but instead while an onlooker to a test being applied to determine the extent of the well's depth.

The question remains, nonetheless, whether the precipitous character of the well's sides is a hidden danger or a danger not present in ponds generally. It can hardly be argued that steep banks are not found in natural bodies of water, nor that even greater dangers, such as holes wherein a wading child might fall, do not threaten young children who swim in them. Nor can we sustain the view that there is anything hidden about a straight sided pool. Thus, although the Florida courts have not ruled on the question, it has been held that a straight decline into a cemented excavation, filled with water, is "obvious and patent." Luallen v. Woodstock Iron & Steel Corp., 236 Ala. 621, 184 So. 182, 184. Similarly, it has been held that a straight decline into water is not a hidden danger where the body of water itself is in no way concealed. Vincent v. Barnhill, 203 Miss. 740, 34 So.2d 363.

We must agree with these holdings that the straight sides of an artificial body of water do not constitute a hidden danger, within the meaning of the Florida rule; moreover, while it is certain that this condition renders a body of water more dangerous than otherwise, it is equally clear that the condition is not limited to artificially-constructed pools. Thus, it appears beyond question that under the generalized statement of the rule the facts of this case could not warrant a finding of liability based upon the Florida attractive nuisance doctrine.

The Supreme Court of Florida, however, in developing the attractive nuisance doctrine of that state, has not circumscribed itself to the application of any single principle, but rather has considered all factors which properly bear on the reasonableness of a property-owner's acts. For example, one who owns property near a school or playground has a greater duty to make his land safe for trespassing children than one whose property is located in a private residential area. Cf. Stark v. Holtzclaw, 90 Fla. 207, 105 So. 330, 41 A.L.R. 1323 and Peters v. City of Tampa, 115 Fla. 666, 155 So. 854 with Johns v. Clay Electrical Co-op Ass'n, Fla., 50 So.2d 710.[1] The age of the child is important. Newby v. West Palm Beach Water Co., Fla., 47 So. 2d 527. And, in recent cases, the degree of danger has been deemed a most significant consideration.[2] Cockerham v. Vaughn, Fla., 82 So.2d 890; Carter v. Livesay Window Co., Fla., 73 So.2d 411.

In the drowning cases, there has invariably been required, for liability, a type of approach to the body of water in question different from and more dan-

---

1. This factor is not controlling, however. Atlantic Peninsular Holding Co. v. Oenbrink, 133 Fla. 325, 182 So. 812.

2. The utility of the thing causing harm is apparently of little weight. Cockerham v.

Vaughn, 82 So.2d 890; Johnson v. Wood, 155 Fla. 753, 21 So.2d 353; May v. Simmons, 104 Fla. 707, 140 So. 780. Cf. Restatement of Torts, § 339(d).

gerous than the approaches to most natural bodies of water. In Allen v. William P. McDonald Corp., Fla., 42 So.2d 706, this requirement was satisfied by the presence of white sand spoil banks which sloped down into the water and were approached at a normal grade. In Newby v. West Palm Beach Water Co., Fla., 47 So.2d 527, and Lomas v. West Palm Beach Water Co., Fla., 57 So.2d 881, where recovery was denied, it was pointed out that the approaches to the bodies of water in question were on slight upward inclines. In Allen, the pond was located along a public highway in a thickly settled community, but in Lomas, it was relatively isolated. The reservoir in Newby was located in a thickly populated area, but the child was almost nine years old. In Allen, the sand banks not only attracted the child to the water but because of their sloping character caused him to slide into it; in Lomas, where the alluring feature of a rainbow-colored spray was present, it was not alleged that the rainbow effect was the cause of the child's swimming in the water.

We are of the view that a comparison of the facts of these cases with those of the case at bar, and the application of the general rule discussed above show clearly that allowing recovery under facts such as those before us would be an unwarranted extension of the doctrine as it is interpreted in Florida. There was nothing about the approach to the well in this case which would cause one to slip or fall into it any more than one would fall into any natural body of water. The well was quite isolated, and there was no alluring feature about it other than the fact that one could swim in it. Nor can it be said that the children did not realize the risk.[3] Moreover, in none of the drowning cases, nor in any of the other attractive nuisance cases in Florida, did the property-owner make

such persistent efforts to keep youthful trespassers away, as did the railroad here. It cannot be called upon to insure the success of those efforts, nor estopped to assert them in its defense because it had reason to know that they were being ignored.

Thus, neither under the rule itself nor in any of the applications of the rule in the aforementioned cases can the plaintiff find a basis for liability against the railroad. It follows that the judgment was right and must be affirmed.

Affirmed.

---

3. Under the heading "Artificial Conditions Highly Dangerous to Trespassing Children" the Restatement of Torts includes as one of the tests of liability the fact that "the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it." Restatement of the Law of Torts, § 339(c). p. 920.