501 So.2d 622 (1986)
WALT DISNEY WORLD CO., Etc., et al., Appellants,
v.
Marietta GOODE, Etc., et al., Appellees.
No. 85-680.
District Court of Appeal of Florida, Fifth District.
December 4, 1986.
Rehearing Denied January 14, 1987.
*623 John L. O'Donnell, Jr., and Thomas B. DeWolf of DeWolf, Ward & Morris, P.A., Orlando, for appellants.
Joel D. Eaton of Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin, P.A., and Freidin & Hirsch, P.A., Miami, for appellees.
ORFINGER, Judge.
On August 11, 1977, four year old Joel Goode drowned in a man-made waterway or moat at Walt Disney World. He was with his mother, Marietta Goode, who noticed that he was missing shortly after 11 P.M. Approximately three hours later, Joel's body was found in five feet of water a short distance from where he had become separated from his mother. An autopsy found no evidence of foul play and established the cause of death as drowning. No one saw Joel enter the waterway.
Joel's parents sued Walt Disney World for the wrongful death of their son. The jury returned a verdict of $1,000,000 for Joel's father, Harry Goode, and $1,000,000 for Joel's mother, Marietta. The jury also determined that Disney and Joel's mother were each fifty percent negligent. Accordingly, a judgment was entered for $500,000 dollars for the mother and $1,000,000 for the father. On appeal, Disney argues that the artificial waterway was not unreasonably dangerous nor did it constitute a trap, and thus as a matter of law, Disney was not negligent. Even assuming some negligence on its part, Disney contends that the damages awarded were excessive.
Walt Disney World is a place of public amusement, where thousands of adults and children are entertained daily for the price of admission. Joel Goode was a paying patron and thus a business invitee on the premises. The accident occurred at night, when crowds were forming to watch the 11:30 P.M. Main Street "Electric Light Parade." The legal principles which should be applied in this case are exactly the same as those which would be applied had Joel Goode fallen at night into an open hole dug by Disney employees on one of its walkways and left without barricades, lights or other warning, or in cases where a plaintiff drives his motor vehicle off an unbarricaded dead end street into a bay or canal. See e.g. City of Tampa v. Finley, 152 Fla. 335, 11 So.2d 576 (1943); City of Hialeah v. Revels, 123 So.2d 400 (Fla. 3d DCA 1960). Under these circumstances Joel would not have become a trespasser and Disney's liability would not depend on the attractive nuisance doctrine or upon a finding that Joel's injury was caused by a trap or some unusual element of danger. Instead, the issue of liability would turn upon the issue of whether Disney had used ordinary or reasonable care for the protection of the safety of its patron.
There is no evidence in this case that Joel Goode entered the waterway to swim or bathe. Instead, the evidence lends itself to the conclusion that he fell in. Joel Goode did not become a trespasser by falling into the moat. Disney employees testified that they were aware of the fact that young children frequently climbed the short fences to play in the grassy area adjacent to the moat. As we pointed out in Goode v. Walt Disney World Co., 425 So.2d 1151 (Fla. 5th DCA 1982), pet. for rev. den., 436 So.2d 101 (Fla. 1983), (Goode I), "[a]ccess to the edge of the moat is access to the moat itself." Id. at 1156.
Whether or not Disney is liable for the drowning of the infant decedent turns on the ordinary rules of negligence as they apply to a business invitee at a place of public amusement. The duty owed to a business invitee by the operator of a place of public amusement was said in Wells v. Palm Beach Kennel Club, 160 Fla. 502, 35 So.2d 720 (1948) to be:
Places of amusement where large crowds congregate are required to keep their premises in reasonably safe condition *624 commensurate with the business conducted. If the owner fails in this, and such failure is the proximate result of injury to one lawfully on the premises, compensatory damages may be recovered if the one injured is not at fault. J.G. Christopher Co. v. Russell, 63 Fla. 191, 58 So. 45, text 47, Ann.Cas. 1913C, 564. One operating a place of amusement like a race course where others are invited is charged with a continuous duty to look after the safety of his patrons... .
We do not mean to imply that they are insurers of the safety of their patrons, but we do say that reasonable care as applied to a race track requires a higher degree of diligence than it does when applied to a store, bank or such like place of business. [Emphasis added].
Id. 35 So.2d at 721. See also Rainbow Enterprises, Inc. v. Thompson, 81 So.2d 208 (Fla. 1955) (applying the same rule of law to scenic gardens) and Brightwell v. Beem, 90 So.2d 320 (Fla. 1956) (applying the same rule to an amusement park and bathing beach when the injury occurred in the water).
The attractive nuisance doctrine, relied upon by the dissent, is an exception to the rule of nonliability for injury to infant trespassers. Johnson v. Wood, 155 Fla. 753, 21 So.2d 353 (1945). Originally known as the "turntable doctrine," the attractive nuisance doctrine came into being as a means of providing relief to children who were allured or enticed upon the land by a condition, instrumentality, machine or other agency dangerous to children of tender years, and who were injured by the very thing that attracted them. See Keaton, Prosser and Keaton on the Law of Torts 400 (5th ed. 1984); 62 Am.Jur.2d Premises Liability § 138, 139 (1972). The attractive nuisance doctrine elevates the duty owed by the property owner to the child from merely having to refrain from willful and wanton negligence, to a duty of reasonable care. Because Joel Goode had the status of invitee as a paying patron, the liability of Disney can be established without invoking the attractive nuisance doctrine. As was stated by the supreme court in Green Springs, Inc. v. Calvera, 239 So.2d 264 (Fla. 1970) in an action against a homebuilder and owner-developer of a housing project for the death of an infant where the parties argued the applicability of the attractive nuisance doctrine:
[T]he child killed in this case was not a trespasser, so there is no need to search for a doctrine separate from the rules of ordinary negligence law to support a duty of care toward her.
Id. at 265.
The rule relied upon by the dissent, going to artificial ponds and the liability of owners thereof, had its inception (and has its continued application) in attractive nuisance cases. See Allen v. William P. McDonald Corp., 42 So.2d 706 (Fla. 1949) (the question in Allen was whether the artificial lake might be amenable to the attractive nuisance doctrine so as to establish a duty of reasonable care owed the trespassing child by the lake's owner).[1] The clear import *625 of the general rule, that the owner of an artificial body of water is not liable for drownings therein unless the artificial waterway is constructed so as to constitute a trap or unless there is some unusual element of danger lurking about it not existent in ponds generally, is simply that in the absence of a trap, owners of artificial bodies of water owe no greater (or lesser) duty to infant trespassers than do owners of property with naturally occurring bodies of water. In the absence of a trap or unusual element of danger, artificial bodies of water present perils which are or should be obvious to trespassing children and thus do not constitute attractive nuisances. See 16 A.L.R.3d § 8 and cases cited therein. Any alleged negligence of an owner thereof may be tested by the rules of ordinary negligence law. In the presence of a trap or unusual element of danger, the attractive nuisance doctrine is applicable to elevate the status of the trespassing child because the incapacity of age of the trespassing child does not permit him to appreciate the dangers involved.
Sub judice a major contention at trial was that Disney was negligent in not taking the precautions necessary to keep the child from falling into the water. The plaintiffs presented evidence from which the jury could conclude that, among other things, Disney was negligent in the following respects: (1) failing to provide barrier fences of adequate height to prevent access by small children to the otherwise unprotected moat; (2) designing and constructing the land areas adjacent to the moat with an unreasonably steep slope, creating a rolling or falling hazard to small children; (3) designing and constructing the moat to contain water of an unreasonable depth constituting a drowning hazard to small children; and (4) failing to provide an adequate warning to parents of the potential danger. Both the manager of safety and occupation and the manager of loss prevention for Disney testified that the fences around the grassy area adjacent to the moat were not designed to keep children out of the moat but rather were designed for crowd control and to keep people off the grass. The fences separating the walkway from the grassy slopes to the moat were approved at a height of 31 inches, with a 24 inch "stepping distance" between the bottom and top horizontal rails. Disney's own standards required a fence with a minimum 36 inch stepping distance anywhere there was an interface with a water hazard. There was no fence or other barrier directly adjacent to the moat itself. There was evidence presented from which the jury could conclude that a fence with a 36 inch stepping distance would have effectively prevented children of Joel Goode's age from climbing over it, whereas the lower fence could be easily scaled by such children. The Disney employee who designed the fences in question testified that the short fence was not intended as a safety barrier for the moat nor was it adequate for that purpose.
Disney employees testified that they frequently observed children going over the fences into the grassy area surrounding the moat. Additionally, the moat was built to a depth of 5 feet and it was undisputed that the depth of a similar moat at Disneyland (in California) was only between 1 1/2 to 3 feet deep. Regarding the foreseeability of the accident, Disney's supervisor for guest relations testified that in the twelve months preceeding the accident 11,420 children were reported lost at Disney, although in her four years of experience none had been found harmed or injured. Disney had instituted elaborate procedures for reuniting separated children and parents. From the testimony presented there was evidence from which a jury could determine that Disney had failed in its duty to keep and maintain the premises in a reasonably safe condition commensurate with the business conducted. Therefore this case involves facts and a rule of law much like those in Mertz v. Krueger, 58 So.2d 160 (Fla. 1952) where a guest at a *626 vacation resort fell to the beach from an unguarded bulkhead. In holding that the question of negligence of the owner of the premises was for the jury, the court said:
If there was ever a place where one would not be expected to be on the lookout for pitfalls, booby traps or other dangers, this would seem to be the one.
* * * * * *
The courts over the country are committed to the doctrine that whether or not defendants exercised ordinary care to protect their patrons in cases like this is a question for the jury under appropriate instructions. Wells, et ux v. Palm Beach Kennel Club, 160 Fla. 502, 35 So.2d 720.
Id. at 162.
Whether Disney breached its duty of reasonable care to the decedent by leaving the moat unprotected under the circumstances presented here was a factual question to be determined by the jury. It is peculiarly a jury function to determine what precautions are reasonably required in the exercise of a particular duty of due care. Orlando Executive Park v. P.D.R., 402 So.2d 442, 446 (Fla. 5th DCA 1981), affirmed, Orlando Executive Park v. Robbins, 433 So.2d 491 (Fla. 1983). Similarly, proximate causation was also a jury question. Goode I, at 1156. Based on the evidence presented, the jury found that Disney had not complied with its duty of due care and that this failure proximately caused the child's death, and we will not disturb those findings because the evidence supports them.
Disney also argues that the $1,000,000 damages awarded to each of Joel's parents for past and future pain and suffering caused by the loss of their son was excessive as a matter of law. In determining this point on appeal, we are guided by the supreme court's statement in Bould v. Touchette, 349 So.2d 1181 (Fla. 1977):
In tort cases, damages are to be measured by the jury's discretion. The court should never declare a verdict excessive merely because it is above the amount which the court itself considers the jury should have allowed. The verdict should not be disturbed unless it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate. [citations omitted].
Id. at 1184, 1185. See also Wackenhut Corp. v. Canty, 359 So.2d 430 (Fla. 1978) (record must affirmatively show the impropriety of a verdict for the verdict to be declared excessive). In Winner v. Sharp, 43 So.2d 634 (Fla. 1949) in an opinion written by Justice Terrell, the court said:
Those who have not brought a child into the world and loved it and planned for it, and then have it suddenly snatched away from them and killed can hardly have an adequate idea of the mental pain and anguish that one undergoes from such a tragedy. No other affliction so tortures and wears down the physical and nervous system. Psychosymatic illness of a serious nature may follow. The emotions may be unstrung, the nerves put on edge, and the end effect may be a period in a rest home, a mental hospital, serious physical derangement and sometimes death. Damage for mental pain and suffering is one of the late developments in the law and its potentialities are not restricted as they formerly were because so much has been learned of the evil consequences that flow from mental injury.
Id. at 636, 637.
We are unable to say, as a matter of law, that the award was so inordinately large as to exceed the maximum limit of the reasonable range within which the jury could properly operate. There was unrebutted evidence before the trial court that the Goodes suffered almost complete, full personality changes since the loss of Joel and that their grief was overwhelming, genuine and crushing. The jury saw the parents and heard their testimony, and were in a better position to evaluate the reality of their anguish and suffering than are we from a reading of a cold record. We *627 should not substitute our judgment for theirs. Judgment for plaintiffs is hereby
AFFIRMED.
DAUKSCH, J., concurs.
COBB, J., dissents with opinion.
COBB, Judge, dissenting:
The majority opinion has ignored the true issue in this case: What is the duty owed to children by the owner of premises with a waterway[1] located thereon? The owner of such premises, at least until now, has not been held to the duty of an insurer of the safety of visitors to those premises, whether they were invitees or trespassers. See Brightwell v. Beem, 90 So.2d 320, 322 (Fla. 1956). Certainly, such duties  and this case  are not controlled by cases involving defective sidewalks and unbarricaded streets, as contended by the majority.
The premises cases relied upon by the majority concern business invitees and, without exception, relate to persons who were injured at locations within the express scope of their invitations. See, e.g., Green Springs, Inc. v. Calvera, 239 So.2d 264 (Fla. 1970); Brightwell v. Beem, 90 So.2d 320 (Fla. 1956); Rainbow Enterprises v. Thompson, 81 So.2d 208 (Fla. 1955); Mertz v. Krueger, 58 So.2d 160 (Fla. 1952); Wells v. Palm Beach Kennel Club, 160 Fla. 502, 35 So.2d 720 (1948); Orlando Executive Park v. P.D.R., 402 So.2d 442 (Fla. 5th DCA 1981), approved, Orlando Executive Park v. Robbins, 433 So.2d 491 (Fla. 1983). In the instant case, it is undisputed that neither Joel Goode nor anyone else was ever invited to enter the waterway herein concerned. The waterway and the fenced grassy area next to it clearly were outside the scope of the invitation to the Goodes and other patrons of Disney. See Hickory House v. Brown, 77 So.2d 249 (Fla. 1955); I.R.E. Florida Income Partners, Ltd. v. Scott, 381 So.2d 1114 (Fla. 1st DCA 1979), cert. denied, 388 So.2d 1118 (Fla. 1980). Contrary to the majority opinion, prior trespasses on the grassy area do not alter the status of a subsequent trespasser to that of invitee. Therefore, the attractive nuisance doctrine is apposite to this case because it concerns a trespassing minor.
The general rule is that whether a water hazard is artificial or natural is irrelevant to the issue of liability, especially where the manmade body of water merely duplicates the natural state and is no more deceptive than a natural body of water. See Howard v. Atlantic Coastline Railroad Co., 231 F.2d 592 (5th Cir.1956) (applying Florida law); 62 Am.Jur.2d Premises Liability § 175 at 451-452. Traditionally, liability in cases such as this has turned on whether an artificial body of water is constructed so as to constitute a trap or present some unusual element of danger that does not exist in ponds generally. See Lomas v. West Palm Beach Water Co., 57 So.2d 881 (Fla. 1952); Newby v. West Palm Beach Water Co., 47 So.2d 527 (Fla. 1950); Allen v. William P. McDonald Corp., 42 So.2d 706 (Fla. 1949). See also Kinya v. Lifter, Inc., 489 So.2d 92 (Fla. 3d DCA), review denied, 496 So.2d 142 (Fla. 1986); Starling v. Saha, 451 So.2d 516 (Fla. 5th DCA), review denied, 458 So.2d 273 (Fla. 1984); Hendershot v. Kapok Tree Inn, Inc., 203 So.2d 628 (Fla. 2d DCA 1967); Adler v. Copeland, 105 So.2d 594 (Fla. 3d DCA 1958). In Allen, Justice Terrell, writing for the majority, stated:
The rule supported by the decided weight of the authority is that the owner of artificial lakes, fish ponds, mill ponds, gin ponds and other pools, streams and bodies of water is not guilty of actionable negligence on account of drownings therein unless they are constructed so as to constitute a trap or raft or unless there is some unusual element of danger lurking about them not existent in ponds generally. [Citations omitted].
*628 42 So.2d at 706. The plaintiffs apparently recognized their burden to demonstrate a trap or unusual danger and at trial contended that Disney was negligent in five respects: (1) failure to provide barrier fences adequate to prevent access by children to the artificial moat; (2) having a steep, grassy slope next to the moat; (3) building the moat with slippery sides; (4) designing the moat with an unreasonable depth for small children; and (5) failing to warn parents of the potential danger.
The trial record, however, does not sustain these claims. First, as contended by the defense, the duty to build any fence preventing access to the moat is dependent upon proof that the moat itself constitutes a trap or unusual element of danger not common to ponds generally. Disney concedes that the fence between the area where Joel Goode was last seen and the moat was not a barrier fence, but merely a crowd control fence designed to keep patrons off the grass.[2] The evidence indicates that the drowning of Joel Goode occurred at a location which cannot be characterized as a trap or as having an unusual element of danger. The grassy approach to the water where the body was found is comparatively flat[3] and there is no sudden drop off.[4]
More importantly, the plaintiffs stipulated at trial that no evidence would be introduced that the sides of the waterway were so steep or so slippery as to cause any difficulty for anyone (which would include four-year-olds) to get out of the water. The stipulation apparently was entered, as shown by the record and acknowledged by counsel at oral argument, to prevent introduction by Disney on rebuttal of a videotape showing small children easily traversing the shallow edges of the moat, which gradually sloped out to a depth of five feet some seven to eight feet from shore. The stipulation was modified during trial to allow testimony that a child who could not swim and was already out in the water at a depth over his head would have difficulty getting out of the moat. This, of course, is axiomatic, and obvious to anyone with common sense. It does not reach the issue of the existence vel non of a trap.
In essence, the plaintiffs, for strategic trial purposes, stipulated away the very fact that it was essential for them to establish  i.e., that Joel Goode entered the water and could not get out because of a trap or an unusual element of danger. If there was no such trap or unusual element of danger, as alleged, then the height of the fence, the slope of the grass, the condition of the sides of the moat, the depth of the water, and the failure to warn parents[5] become legally irrelevant.
*629 The case of Hendershot v. Kapok Tree Inn, Inc., 203 So.2d 628 (Fla. 2d DCA 1967), involved a two-year-old boy who drowned in an artificial pond located within an ornamental garden, and the Second District denied liability, citing to Allen and the test enunciated by Justice Terrell. It found that the attractive nuisance doctrine was applicable to those facts, which are legally indistinguishable from those in the instant case, and affirmed the dismissal of the plaintiff's complaint because "there was not alleged the presence of the unnatural, unusual element of danger of the type and nature that is necessary to invoke the attractive nuisance doctrine." Id. at 630. Contrary to the majority's contention, the children in Hendershot and Perotta were not trespassers on the land where the hazard was located.
In the instant case, the evidence simply does not support a finding that the waterway wherein the minor victim drowned was constructed so as to be more dangerous than ponds and bodies of water generally. Indeed, millions of children previously traversed the Disney premises without injury from this waterway. Under these circumstances, the law does not presume to protect individuals from their own fault, bad luck, improvidence or misfortune. "Legal remedies," as Justice Terrell observed in Newby, "should not be confused with Good Samaritan impulses." 47 So.2d at 528. The facts in this case are tragic, and Disney is an enormously successful enterprise. Nevertheless, a deep pocket should not create a liability[6] that would not be imposed upon a poorer defendant. The majority opinion herein has rejected all established Florida precedent in regard to premises liability for the drowning of minors; is in direct conflict with Allen, Hendershot, and other Florida case law; and renders all owners of property with bodies of water thereon potentially liable on a case-by-case basis dependent upon sympathetic jury reactions.
I would reverse.
NOTES
[1] Lomas v. West Palm Beach Water Co., 57 So.2d 881 (Fla. 1952) and Newby v. West Palm Beach Water Co., 47 So.2d 527 (Fla. 1950), also cited by the dissent, dealt with trespassing infant plaintiffs and in both cases the court correctly applied the attractive nuisance doctrine to the facts thereof. With the exception of Kinya v. Lifter, Inc., 489 So.2d 92 (Fla. 3d DCA 1986), the remaining cases cited by the dissent also involved the application of the attractive nuisance doctrine to child trespassers: Starling v. Saha, 451 So.2d 516 (Fla. 5th DCA), pet. for rev. den., 458 So.2d 273 (Fla. 1984) (court held that the complaint properly stated a cause of action under the attractive nuisance doctrine where trespassing child drowned in artificial pond); Hendershot v. Kapok Tree Inn, Inc., 203 So.2d 628 (Fla. 2d DCA 1967) (the attractive nuisance doctrine was held to apply); Adler v. Copeland, 105 So.2d 594 (Fla. 3d DCA 1958) (court found the attractive nuisance doctrine inapplicable as there was no trap and the deceased infant was not a trespasser). In Kinya v. Lifter, Inc., supra, it is difficult to understand why the court discusses the attractive nuisance doctrine, but the important point is the court's recognition that the circumstances presented a factual question for the jury which found that the defendant was not negligent. What is important to note in the attractive nuisance cases and what distinguishes those cases from the case sub judice is that in those cases the children were trespassers on the land where the alleged hazard was located, and did not become trespassers merely by entering the hazard.
[1] Although the waterway herein is often referred to as a "moat," it is simply a picturesque canal that encircles Cinderella's castle in the heart of the Magic Kingdom and is used for swan boat rides. It is in no way analogous to a true medieval moat with steep sides designed to prevent access by invaders.
[2] The majority opinion states: "Disney's own standards required a fence with a minimum thirty-six inch stepping distance anywhere there was an interface with a water hazard." The majority fails to mention that this standard was for bridges and docks extending over the deeper water; there is no evidence that these fences were inadequate or that Joel fell into the water from a bridge or dock.
[3] There was testimony by one Cortland Collier, called by the plaintiffs as an "expert," as to the danger to children of a steep grassy slope adjacent to the waterway at a different location than that where the body was found. It was conceded at oral argument that there was no evidence or contention the accident occurred at that location. Moreover, the acceptance of Collier as an expert qualified to give opinion testimony on water safety was error. The trial court had rejected him as such at a prior trial of this cause, and initially at this trial. As a civil engineer, Collier had once assisted in drafting a proposed swimming pool ordinance for a municipality, but had no other apparent qualifications as a water safety expert.
[4] In Hendershot, a sudden drop off of three feet approximately two feet out from the shoreline was held to be insufficient to impose liability on the landowner.
[5] In point of law, there is no case authority anywhere, prior to the instant case, that implies a duty on the part of the owner of premises to warn parents of young children that the latter may drown in water over their heads. That is an obvious danger parents are responsible to know. See, e.g., Perotta v. Tri-State Insurance Co., 317 So.2d 104 (Fla. 3d DCA 1975), cert. denied, 330 So.2d 20 (Fla. 1976). In the instant case, Mrs. Goode, the mother, had actual knowledge of the existence of the moat, having taken the swan boat ride earlier in their visit.
[6] Interestingly enough, Disney has not challenged the trial court's failure to commensurately reduce the father's award by the same 50% reduction applied to the mother's award because of her negligence. While this result is proper according to Singletary v. National Railroad Passenger Corp., 376 So.2d 1191 (Fla. 2d DCA 1979), the Florida Supreme Court cases cited in Singletary as holding to the contrary, Martinez v. Rodriguez, 215 So.2d 305 (Fla. 1968), and Klepper v. Breslin, 83 So.2d 587 (Fla. 1955), have not been subsequently addressed by either the Florida Supreme Court or this court, and thus this issue would appear to be an open one. See also 9 Fla.St.U.L.Rev. 201 (1981).